## GENERAL AMERICAN TANK CAR CORP. *v.* EL DORADO TERMINAL CO.

No. 129. Argued December 12, 13, 1939.—Decided January 2, 1940.

---

*Mr. Allan P. Matthew,* with whom *Mr. John O. Moran* was on the brief, for petitioner.

*Mr. W. F. Williamson* for respondent.

By leave of Court, *Solicitor General Jackson* and *Messrs. J. Stanley Payne* and *Daniel W. Knowlton* filed a brief on behalf of the Interstate Commerce Commission, as *amicus curiae,* urging reversal.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This was an action in assumpsit brought by the respondent to recover a sum alleged to be due it by the petitioner under the terms of a car leasing agreement. The answer admitted the execution of the agreement

' but pleaded that payment of the sum demanded would amount to the making of a rebate, contrary to the provisions of the Elkins Act.[1] The District Court rendered judgment for the petitioner which the Circuit Court of Appeals reversed, holding the respondent entitled to the full amount claimed.[2] We granted certiorari on account of the importance of the question involved and of the

---

[1] Act of February 19, 1903, c. 708, § 1, 32 Stat. 847, as amended.

"(3). *Receiving rebates; additional penalty and recovery thereof.*— Any person, corporation, or company who shall deliver property for interstate transportation to any common carrier, subject to the provisions of sections 41, 42, or 43 of this title, or for whom as consignor or consignee, any such carrier shall transport property from one State, Territory, or the District of Columbia to any other State, Territory, or the District of Columbia, or foreign country, who shall knowingly by employee, agent, officer, or otherwise, directly or indirectly, by or through any means or device whatsoever, receive or accept from such common carrier any sum of money or any other valuable consideration as a rebate or offset against the regular charges for transportation of such property, as fixed by the schedules of rates provided for in said sections, shall in addition to any penalty provided by said sections forfeit to the United States a sum of money three times the amount of money so received or accepted and three times the value of any other consideration so received or accepted, to be ascertained by the trial court; and the Attorney General of the United States is authorized and directed, whenever he has reasonable grounds to believe that any such person, corporation, or company has knowingly received or accepted from any such common carrier any sum of money or other valuable consideration as a rebate or offset as aforesaid, to institute in any court of the United States of competent jurisdiction, a civil action to collect the said sum or sums so forfeited as aforesaid; and in the trial of said action all such rebates or other considerations so received or accepted for a period of six years prior to the commencement of the action, may be included therein, and the amount recovered shall be three times the total amount of money, or three times the total value of such consideration, so received or accepted, or both, as the case may be." U. S. C., Tit. 49, § 41 (3).

[2] 104 F. 2d 903, 916.

allegation that the judgment was not in accord with prior decisions of this court.

The petitioner is a corporation, unaffiliated with any railroad, which owns and leases tank cars to railroads and to shippers for use in transportation in interstate commerce. The respondent is a wholly owned subsidiary of El Dorado Oil Works, a manufacturer of coconut oil operating a plant at Berkeley, California, and brought the action as assignee of the latter's rights under the lease.

September 28, 1933, the petitioner and the Oil Works entered into an agreement whereby the former leased to the latter fifty tank cars designated in the contract as "permanent cars," at a rental of $27.50 per car per month. The petitioner agreed to supply the Oil Works with such additional cars as it might need for the shipment of its products, on a rental basis of $30.00 per car per month, these to be ordered from time to time as needed and returned when no longer required.

The contract provided that the petitioner would collect, and credit to the rental account of the Oil Works each month, all mileage earned by the cars while in the Oil Works' service, "according to and subject to all rules of the tariffs of the railroads." The petitioner was to pay the cost of repairs and maintenance but the Oil Works was to be responsible for damage or destruction of the cars while on privately owned tracks.

The leased cars were used by the Oil Works for shipment of its products. Such use was important to the Oil Works since the railroads serving its plant were not prepared to furnish shippers a full supply of the kind of cars needed for carrying the oils in question. The railroad tariffs, though stating rates on the Oil Works' products when shipped in tank cars, disclaimed any obligation to furnish cars of the requisite type.

The carriers maintain tariffs applicable to the allowances to be made to car owners for the use of tank cars, which provide for payment of one and one-half cents per car mile loaded and empty. The tariffs also embody rules which, during part of the period in controversy, stated that mileage payments would be made only to the party whose reporting marks appeared upon the cars and during part of the period that "mileage for the use of cars of private ownership will be paid for loaded and empty movements only to the car owner—not to a lessee." The rules precluded payment of the mileage allowance to the Oil Works under the circumstances of this case, since the lease stipulated that all the leased cars should bear the reporting marks of the petitioner.

The petitioner complied with the provisions of the agreement until July 2, 1934, when the Interstate Commerce Commission rendered its decision in Use of Privately Owned Refrigerator Cars, 201 I. C. C. 323, in which it considered the payment of mileage allowances to shippers either directly or through car owners, which payments exceeded the total of the agreed rental for the use of the cars and any additional actual expenses of the shipper in connection with the cars. In that case the Commission held that such payments operated to give the lessee transportation of his products at lower rates than those paid by other shippers who use cars furnished by the carriers and thus amounted to a rebate from the published transportation rates. The petitioner's practice had been to collect the mileage, deduct the rental due, and pay over the balance monthly. After the rendition of the Commission's decision the petitioner collected the mileage from the railroads, credited the Oil Works with the rental due, retained the balance, and refused to pay it over. The ground of its refusal was that to follow the former practice would render it a participant in illegal rebating.

It was disclosed at trial that throughout the period covered by the respondent's claim the mileage allowances had, in every month, exceeded the rentals, leaving a substantial balance which the respondent insisted should be paid to it. During the seven month period from November 1, 1934, to May 31, 1935, this balance amounted to $17,614.13.

The District Court concluded that payment to the shipper of any excess of the mileage allowances over stipulated rents would constitute a rebate prohibited by the Elkins Act and, in that view, held that the respondent could not recover. The Circuit Court of Appeals permitted a recovery on the ground that § 15 (13)[3] of the Interstate Commerce Act authorized the payment of mileage allowances by railroads for the use of private cars furnished by shippers for the transportation of their own commodities; that the practice had been approved by the Commission, and maximum rates fixed by it; that the one and one-half cents per car mile allowance appeared in the carriers' published tariffs dealing with the subject and was, and would remain until action by the Commission, the legal rate payable for the use of such cars; that, while it is open to the Commission to inquire, on its own motion or on complaint, as to any abuses in connection with such tariff mileage allowances, until the Commission does act, the carriers are justified in continuing to pay the scheduled rates; that the shipper in this case is the furnisher or supplier of privately owned cars to the carriers, and the lease agreement constitutes the petitioner a mere agent for the collection and payment of the mileage allowances to the shipper; and that, consequently, the payment, by the petitioner to the shipper, of any excess of the mileage earnings is not a rebate within the terms of the Elkins Act.

[3] U. S. C. Tit. 49, § 15 (13).

The petitioner insists that this conclusion is wrong and that of the District Court correct. The Interstate Commerce Commission, as a friend of the court, has filed a brief in which it contends, first, that the District Court was without jurisdiction to entertain the cause, as the question involved is one primarily for administrative action by the Commission and, secondly, that the payment of the excess credits by the petitioner would result in payment of a prohibited rebate to the shipper.

We hold that the District Court had jurisdiction but that, upon disclosure of the terms and operation of the lease contract, it should not have proceeded to adjudicate the rights and liabilities of the parties in the absence of a decision by the Commission with respect to the validity of the practice involved in the light of the provisions of the Interstate Commerce Act.

Freight cars are facilities of transportation, as defined by the Act.[4] The railroads are under obligation, as part of their public service, to furnish these facilities upon reasonable request of a shipper,[5] and therefore have the exclusive right to furnish them. They are not, however, under an obligation to own such cars. They may, if they deem it advisable, lease them so as to be in a position to furnish them according to the demand of the shipping public and, if the carriers do so lease cars, the terms on which they obtain them are not the subject of direct control by the Interstate Commerce Commission.[6] If the carriers pay too much for the hire of such cars the Commission may, of course, refuse to allow them to reflect such excess cost in their tariffs. The lessor of such cars to a railroad, however, is not itself a carrier or en-

---

[4] 49 U. S. C. § 1 (3).

[5] 49 U. S. C. § 1 (10) (11); *Pennsylvania R. Co.* v. *Puritan Coal Co.*, 237 U. S. 121; *Pennsylvania R. Co.* v. *Sonman Shaft Coal Co.*, 242 U. S. 120.

[6] *Ellis* v. *Interstate Commerce Comm'n*, 237 U. S. 434.

gaged in any public service. Therefore its practices lie without the realm of the Commission's competence. 

Cars thus leased and used by the carriers are to be distinguished from so-called private cars with which we are here concerned. Shippers, particularly those who require a specialized form of freight car for transportation of their products, may, and do, own cars adapted for the purpose. They may, and do, in lieu of owning such facilities, rent them from the owners. Car companies owning a large number of a special type of freight car, some affiliates or subsidiaries of railroads and others, like the petitioner, wholly independent and financed by private capital, have, for many years, been in the business of leasing cars to shippers. The practice has been well known and well understood. It is entirely lawful and the Commission has so held.[7] But the practice cannot modify the requirements of paragraph (13) of § 15,[8] which governs the payment of allowances for private cars, and invests the Commission with authority to find and declare what allowances are reasonable.

As the Circuit Court of Appeals has pointed out, different shippers may have differing costs in respect of privately owned cars furnished the carriers. Nevertheless, as the allowances to be made them by the carriers

---

[7] In the Matter of Private Cars, 50 I. C. C. 652.

[8] *Allowance for service or facilities furnished by shipper.*—If the owner of property transported under this chapter directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for under this section. 49 U. S. C. § 15 (13).

for the use of such cars must be the subject of published schedules,[9] and must be just and reasonable,[10] the Commission is compelled to ascertain in the light of past and present experience a fair and reasonable compensation to cover such costs and prescribe a uniform rate which will reflect such experience. It is inevitable that some shippers may be able to furnish facilities at less than the published allowance while others may find their costs in excess of it. This fact, however, does not militate against the fixing of a uniform rate applicable to shippers properly classified by the Commission.[11]

From what has been said it results that the shipper in this case was permitted by law to furnish freight cars for the transportation of its products and to be paid a reasonable allowance for performing this portion of the public service which the carrier was bound to render, and that the law requires that the amount and conditions of payment of such allowance shall be set forth in a published tariff. If this is not done, the shipper may complain to the Commission, to the end that a proper allowance be ascertained and made effective by a schedule duly published. In the present case this has not been done. Nor has the shipper ever applied to the Commission for its decision as to what was a proper allowance for the cars furnished by it.

As we have stated, the mileage tariffs published by the American Railway Association, which govern the instant case, require that private cars be marked with so-called reporting marks or initials together with a car number. These marks are for the purpose of keeping records of the car's movements and mileage. Appropriate marks to designate privately owned cars are assigned by the Rail-

---

[9] 49 U. S. C. § 6 (1) (7).

[10] 49 U. S. C. § 15 (13), *supra,* note 9.

[11] Compare *Interstate Commerce Comm'n* v. *Diffenbaugh,* 222 U. S. 42, 45.

way Association to their owners. The rules appearing in the tariff during a portion of the period in question provided that the mileage for the use of cars of private ownership would be paid to the car owner or to the party who had acquired the car or cars as shown by the permanent reporting marks. The lease agreement provided that the cars should bear the reporting marks of the petitioner. Thus the carrier was bound by its rules to pay the allowance to the petitioner. During a portion of the term in controversy the rules provided that mileage could be paid only to the car owner, not to a lessee. Here again the rules precluded the payment of the allowance by the carrier to the shipper.

The Circuit Court of Appeals has held, and we think correctly, that the shipper—the Oil Works—furnished the cars to the carrier in the present instance. The petitioner did not. The shipper was then entitled, under the plain terms of § 15 (13), to be paid by the carrier a just and reasonable allowance for providing the facility. It seems clear that no rule or regulation of the carrier may provide for the payment of such allowance to any other person. And we think the consideration that, in this case, the petitioner acted merely as collecting agent for the shipper, does not take the case out of the Commission's jurisdiction. If it should appear that, with respect to the tank cars in question, the shipper-lessee is making substantial profits on leased cars, by reason of the excess of the mileage allowances over the rentals paid, it might in the light of all the facts be found that the shipper is, in the result, obtaining transportation at a lower cost than others who use cars assigned them by the carriers or own their own cars. The Commission has found that, in the case of refrigerator cars, held under similar leases, this has been the case.[12] The inquiry into the lawfulness of the prac-

tice is one peculiarly within the competence of the Commission.[13]

As the tariffs now contain no provision for the payment of car mileage allowances by the railroad to the shipper directly, and as, upon the face of things as disclosed by this record, the shipper is apparently reaping a substantial profit from the use of the cars, a clear case is made for the exercise of the administrative judgment of the Commission. The Circuit Court of Appeals, without supporting evidence in the record as to any specific items, said that there are obviously other expenses which the shipper must bear over and above the actual rental paid. If this were so, the reflection of those expenses, as well as the rental itself, in the allowance paid by the carrier to the shipper for the use of the latter's cars, would be a matter for the administrative judgment of the Commission and not for determination by a court.[14]

We have said that the Commission insists the District Court was without jurisdiction of the cause. With this we do not agree. The action was an ordinary one in assumpsit on a written contract. The court had jurisdiction of the subject matter and of the parties. But it appeared here, as it did in *Mitchell Coal Co. v. Pennsylvania R. Co.,* 230 U. S. 247, that the question of the reasonableness and legality of the practices of the parties was subjected by the Interstate Commerce Act to the administrative authority of the Interstate Commerce Commission. The policy of the Act is that reasonable allowances and practices, which shall not offend against the prohibitions of the Elkins Act, are to be fixed and settled after full investigation by the Commission, and that there is remitted to the courts only the function of

---

[13] *Great Northern Ry. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285, 290, 291.

[14] *Mitchell Coal Co.* v. *Pennsylvania R. Co.,* 230 U. S. 247; *Morrisdale Coal Co.* v. *Pennsylvania R. Co.,* 230 U. S. 304.

enforcing claims arising out of the failure to comply with the Commission's lawful orders.

When it appeared in the course of the litigation that an administrative problem, committed to the Commission, was involved, the court should have stayed its hand pending the Commission's determination of the lawfulness and reasonableness of the practices under the terms of the Act. There should not be a dismissal, but, as in *Mitchell Coal Co.* v. *Pennsylvania R. Co., supra,* the cause should be held pending the conclusion of an appropriate administrative proceeding. Thus any defenses the petitioner may have will be saved to it.[15]

The judgment of the Circuit Court of Appeals is reversed and the cause is remanded to the District Court for further proceedings in conformity to this opinion.

*Reversed.*

---

[15] Compare *Morrisdale Coal Co.* v. *Pennsylvania R. Co.,* 230 U. S. 304, 314, where no rights could be saved by retaining the cause; and *St. Louis, B. & M. Ry. Co.* v. *Brownsville District,* 304 U. S. 295, 301, where the District Court was asked to make an order which the Commission alone had authority to make.