## CITY OF NEW ORLEANS v. TEXAS & N. O. R. CO.

No. 13633.

United States Court of Appeals Fifth Circuit.

April 4, 1952.

Michel Provosty, New Orleans, La., for appellant.

Harry McCall, New Orleans, La., for appellee.

Before SIBLEY, RUSSELL and RIVES, Circuit Judges.

SIBLEY, Circuit Judge.

Appellee, Texas and New Orleans Railroad Company, filed in the district court a petition for a declaratory decree establishing the validity of certain contractual arrangements between it and the City of New Orleans, acting through its Public Belt Railroad Commission, touching the handling of a class of freight cars called "hold cars", and seeking a perpetual injunction against breach thereof which was threatened. The City countered with a suit in a State court, seeking to recover a large sum for such handling in the past, denying the validity of the contract price for the service. The latter suit was removed into the district court and consolidated with the former, and on trial a decree was entered for the relief sought by the Railroad Company, and the claims of the City were dismissed. The City appeals.

Under provisions of the Louisiana Constitution and statutes, the City of New Orleans has, since 1908, owned and operated, through the Public Belt Railroad Commission, a department of the city government, a system of tracks which belt the crescent-shaped city and give access to the many wharves along the river and the railroad depots within the city, having nearly a monopoly of the switching traffic. The switching of cars at New Orleans was

held to be interstate commerce in Illinois Central R. Co. v. DeFuentes, 236 U.S. 157, 35 S.Ct. 275, 59 L.Ed. 517 and the Public Belt Railroad has uniformly been dealt with as a railroad subject to the regulation of the Interstate Commerce Commission. It publishes its tariffs for its services as do others.

Prior to 1932, the railroads approaching New Orleans from the west of the Mississippi River crossed the river on train ferries, appellee being one. Principally to eliminate these ferries a bridge across the river several miles above the city was projected, and the Louisiana Constitution was amended and statutes passed to authorize the City, acting through its Public Belt Railroad Commission, to construct, maintain and operate the bridge for railroad and highway purposes. An application was made to the Interstate Commerce Commission under Section 1(18) of the Interstate Commerce Act, 49 U.S.C.A. § 1(18), for a certificate of public convenience and necessity thus to extend the tracks of the Public Belt Railroad, which was granted November 25th, 1930. See New Orleans Public Belt R., Construction, 166 I.C.C. 761. The Railroad Company also applied for, and obtained, a certificate to abandon certain of its tracks on the west side of the river and its train ferry, and to build tracks to connect with the bridge, and to operate over it. Texas and New Orleans R. Co., Operation, 189 I.C.C. 184. It and the City entered into two elaborate contracts dated November 5, 1932, one called the Bridge Contract, which looked largely to paying for the bridge through rentals and contributions for the use of the bridge; the other, called the Track Contract, having to do principally with the relations of the two railroads in handling the traffic across the bridge. These two contracts were approved by the Interstate Commerce Commission. Under date of July 15, 1940, the City and Railroad Company agreed on an extensive amendment and modification of the Bridge and Track Contracts, which was submitted to the Interstate Commerce Commission, as was provided in it, and the Commission held that the matter was "within the scope of Section 5(2) of the Interstate Commerce

Act, as amended [49 U.S.C.A. § 5(2)]; that the terms and conditions of the proposed agreement are just and reasonable; and that the transaction will be consistent with the public interest. * * * An appropriate supplemental order will be entered." Texas and New Orleans Railroad Co., Operation, 247 I.C.C. 624.

This amended contract for the first time dealt with the "hold cars" which are the subject of this litigation. It speaks of cars which are delivered by the Railroad Company at the west end of the bridge "without any definite destination", and designates them as "hold cars" because Public Belt is to hold them "without charge or cost except as elsewhere stated herein on its yards east of the Mississippi * * * until in each case Public Belt shall receive orders from the Company, at which time the car or cars in question shall be expeditiously moved by Public Belt as hereinbelow set forth." Several kinds of ultimate destinations are set forth, and the mode of handling of each specified, and the charges to be made stated. The carrier is to retain its liabilities as carrier, but Public Belt is to assume loss by its acts or omissions, and is to afford adequate police protection from the time the cars are delivered to it.

These "hold cars" are principally such as are moving under negotiable bills of lading, the holders of which are not known; or cars whose contents are to go aboard ships which may not arrive for several days, or which are delayed in unloading. When the ship is ready, prompt delivery at the wharf is necessary to avoid delaying the ship. The hold cars were not at first numerous, but after the war broke out in 1941, they became quite numerous, one year seven thousand of them, and they continue numerous. The yard devoted to hold cars, though having several tracks, is often congested, and to reach one or two needed cars scores of them may have to be shifted, so that much additional shifting crew time is needed. The Public Belt considered that it was not fairly paid for this service, the pay being usually only the regular charge for switching a car,

and it gave written notice that it would not receive hold cars after March 15, 1945, unless additional compensation, to be based on a cost study, were agreed on. Appellee, claiming a clear contract right to have the service at the rate it was paying, as has been said, sought and obtained a declaratory decree that its contract was valid, obtained an interlocutory injunction, and finally a perpetual injunction against the Public Belt refusing to accept such cars at the rate fixed by the contract. The claims of the City for more pay were dismissed.

■ 1. We see no reason to doubt the general validity of the contract of July 15, 1940, and its provisions touching hold cars. One contention of the City is that the contract was not validly made by the Public Belt Commission, because the State Constitution provides that the Commission shall consist of the Mayor and sixteen taxpayers, seventeen in all, and says: "Provided that the City of New Orleans, through the Public Belt Railroad Commission shall have the authority to contract on such terms and conditions, and for such duration, as may be approved by a vote of three-fourths of all the members of said Commission, with any railroad company or railroad companies entering or hereafter entering New Orleans from the west bank of the Mississippi River across said bridge, for the use of the bridge, its approaches, and of any tracks of the Public Belt Railroad system * * *." Ten members only voted for the contract, but there were at the time four vacancies, so that the Commission at the time consisted of thirteen members. Ten is of course not three-fourths of seventeen, but is three-fourths of thirteen. The words "all the members of said Commission" include only such persons as are at the time members and capable of voting. They do not include persons who, by death or resignation, have ceased to be members, or those unknown persons who may later be appointed. Of the cases cited to us, State ex rel. Peterson v. Hoppe, 194 Minn. 186, 260 N.W. 215, seems most nearly in point. The Louisiana Court in State ex rel. Garland v. Guillory,

184 La. 329, 166 So. 94, 102, held that "two-thirds of the membership of each house" of the Legislature means two thirds of a quorum of each house. To the same effect is Missouri Pacific R. Co. v. Kansas, 248 U.S. 276, 39 S.Ct. 93, 63 L.Ed 239.

2. The contracts respecting this bridge and its use may be renewed for a period of 999 years. But because they concern interstate and foreign commerce they are subject to federal laws regulating such commerce, and are subject to the powers vested in the Interstate Commerce Commission. This was recognized at every step. The last contract, in Section XVI expressly states that it is to become effective only if and so far as the Commission shall approve. Now the Commission, in its report of August 28, 1941, held that the proposed modification of the contracts "is within the scope of section 5(2) of the Interstate Commerce Act as amended; that the terms and conditions of the proposed agreement are just and reasonable." The terms and conditions proposed for handling "hold cars" were thereby established by the Commission as just and reasonable. But they are not unchangeable, for by section 5(9) of the amended Act, it is provided: "The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (2), or (7), as it may deem necessary or appropriate." If the terms and conditions of handling hold cars have now become unjust and unreasonable, a showing to that effect can be made to the Commission for a supplemental order. Since the Public Belt is said to have tariffs of file with the Commission, though they are not before us, it may be that relief can be reached by amending the tariff.

We are of opinion that the City was not within its rights in simply announcing that it no longer would receive hold cars under the contract.

3. There is force in the City's argument that the holding of these many cars on its tracks for an indefinite period at the will of the appellee is not mere switching or transportation, but also storage

and that the complication and expense that have arisen are burdensome and not specially compensated under the contract. But this storage is not an independent matter, but an incident of transportation, like demurrage is, and any special compensation charged against the carrier will ultimately be reflected in charges made against the shipping public. The unreasonableness of the present compensation, and what would be reasonable if this is not, are questions which courts are not well equipped to handle. They belong rather to rate making, which is in general a function of the Commission. The principle of Texas & Pacific Railroad Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553; Armour & Co. v. Alton R. R. Co., 312 U.S. 195, 61 S.Ct. 498, 85 L.Ed. 771, and a host of cases where other expert public agencies were involved, ought to prevail here, and the court should be cautious in applying its own remedies.

4. The City is making claims for more compensation for handling hold cars before the amending contract was formally made and approved by the Interstate Commerce Commission. They were handled under a traffic agreement between the managing officers of the railroads. We think the matter was within the usual authority of general managers, as no contract was then in existence approved by the Commission, as there has been in later years. If the payments then made were according to the contract made by these officers, and not in conflict with filed and published tariffs, they were lawfully collected, and no cause appears for a recovery by court judgment of more pay.

5. Transactions since the amending contract of July 15, 1940, has become fully effective, are governed by it. It appears that there has been, by letters, a modification since, affecting the mode of transfer of cars but not the charges. We doubt its being enforcible as a binding addition to the approved contract.

While the Court in our opinion was correct in holding the approved contract legal and binding, and might have

so declared, a perpetual injunction against the Public Belt forbidding it ever to refuse to receive hold cars at the compensation fixed by the contract is wrong, for that excludes the remedy before the Commission. The injunction ought to have preserved that remedy, if otherwise proper.

█ We are further troubled as to whether there is any showing of irreparable injury which would authorize the remedy of injunction. The parties are in disagreement only as to compensation. The Public Belt seems to be complaining mainly because of the extra expense and congestion caused by taking so many cars for storage in its east side yard. There is testimony that the Railroad Company has ample facilities of its own to store the cars. To put them there would only deprive the Company of the use of some of its tracks. If there are not enough tracks, the Interstate Commerce Commission can order more built. In the view we take of the functions of the Commission, the case ought to be before that body. We will hold the matter in the status it had before the final decree, to see what, if any, relief, future or retroactive, the Commission may see fit to order. See General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361.

The decree appealed from is reversed and set aside. The consolidated cause shall remain pending in the district court, with the temporary injunction reinstated and of force, for four months from the date of entering the remitter of this court in the district court; and if then proceedings have been begun before the Interstate Commerce Commission by either party touching the matters here involved, till such proceedings are ended; and thereafter the district court should take such action as shall then appear to be proper. To this end the cause is remanded to the district court with direction to act accordingly.

Reversed with direction.