**UNITED STATES of America, Appellant,**

v.

**KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellee.**

**No. 15013.**

United States Court of Appeals, Eighth Circuit.

Nov. 19, 1954.

Rehearing Denied Jan. 10, 1955.

COLLET, Circuit Judge, dissented.

Hubert H. Margolies, Atty., Dept. of Justice, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Edward L. Scheufler, U. S. Atty., Kenneth C. West, Asst. U. S. Atty., Kansas City, Mo., and Melvin Richter, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Richard S. Righter, Kansas City, Mo. (William E. Davis, Joseph R. Brown, Kansas City, Mo., William M. Stapleton, Albany, and Lathrop, Righter, Blackwell & Parker, Kansas City, Mo., on the brief), for appellee.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

Commodity Credit Corporation, 15 U.S.C.A. § 713 et seq., shipped, between April 20, 1945, and August 2, 1946, over Kansas City Southern Railway Co., from Kansas City, Mo.-Kan., to Port Arthur, Texas, 5915 cars of wheat, designated for export to European, Asiatic and African ports.

The rate fixed by the carrier's tariff for a line-hauling of such export grain from Kansas City to Port Arthur was 24½ cents, with a statement in the tariff that this included charges for unloading, cleaning, fanning, and turning of the grain at Port Arthur, storage of it there for 30 days, fire and explosion insurance thereon during that period, and transfer of it from the elevator to the export vessel.

Commodity Credit had in effect at the time, at all of the Gulf ports used by it for the exporting of grain, a standard terminal-elevator program of its own, for the handling, conditioning, storing, and loading of its export grain, resting upon arrangements entered into by it under the Uniform Grain Storage Agreement of the Department of Agriculture. The record contains a stipulation that no Commodity Credit grain was stored at any Gulf port, during the period involved, except under these Uniform Grain Storage Agreement relationships.

Each of the cars of wheat involved was taken over, as it arrived in Port Arthur, and handled under this existing program, without any request upon the Railway to furnish the terminal services included in its tariff rate, and without any indication, so far as the record shows, of a desire or willingness on the part of Commodity Credit at the time to allow the Railway to retain control of and handle the grain at Port Arthur, as an exception to or departure from Commodity Credit's establishd Gulf-port program.

The tariff contained no provision for any allowance or deduction from the rate applicable to such export grain, in the event that a shipper did not need, or chose not to avail himself of, whether in whole or part, the included terminal services at Port Arthur. Also, it might incidentally be observed that the record shows that the existing tariff rates for a line-hauling of such export grain from Kansas City to any of the other Gulf ports located on or west of the Mississippi River, used by Commodity Credit (Galveston, Houston, Texas City and New Orleans), were as high as the tariff rate to Port Arthur and had no such terminal services as were agreed to be provided at Port Arthur included in the rates to those ports, nor was there any provision in the tariffs that the carrier should absorb any part of the cost of a shipper's obtaining such services there.

The Railway billed Commodity Credit, and Commodity Credit made payment, for the shipments involved, on the basis of the tariff rate. Later, however, on July 28, 1948, the Government sued the Railway in the District Court,[1] to recover

---

1. The Government's right to maintain the suit rested upon the fact that Commodity Credit was a government-owned corporation, created and serving as a govern-

the amount of the cost to Commodity Credit of the terminal services provided by it for the wheat under its own program, on the theory that, since the carrier had not actually furnished the terminal services, Commodity Credit legally had been overcharged in the amount of the cost of its own terminal services.[2] To this count for the recovery of statutory overcharges as such, there was subsequently added by amendment another count, seeking alternatively to recover the amount of its terminal-program cost for the wheat as damages for breach of contract, on the theory that the carrier had failed and neglected to perform the service obligations resting on it under the tariff.

In neither cause of action was it claimed that the Railway had been requested or had refused to furnish the terminal services covered by the tariff, but the allegation made was simply that the carrier had "failed and neglected" to furnish such services.[3]

The case was tried to the court, sitting without a jury, on the merits of all the issues raised by the pleadings. The court's consideration, however, did not reach to the merits generally of the controversy, for it concluded that the action was properly entitled to be dismissed as a matter of law, on the grounds (1) that, since the carrier admittedly had charged Commodity Credit the fixed tariff rate, there was no basis for claiming that any "overcharges" as such had been made, within the meaning of that term under the statute;[4] and (2) that, since the tariff rate was in legal form a unitary charge, the attempt to recover the value of the terminal services not furnished by the carrier amounted simply, under either count of the complaint, to a question of resolving what allowance or deduction, if any, should be made from the tariff rate, on the basis of stripping down the componency of the carrier service covered by the tariff and the general charge provided therefor, and placing a separable value on a part of the elements involved—which the court felt that under the statute only the Interstate Commerce Commission, and not a court, had the power and competence to do.[5]

After the court's dismissal of the suit on these grounds, 116 F.Supp. 484, the Government filed a motion for reconsideration, or alternatively, if that motion should be denied, a motion to set aside the order of dismissal and hold the case in abeyance until a resolution of the administrative question regarded by the court as being excludingly involved could be obtained from the Interstate Commerce Commission. The court denied both of these motions.

mental agency and instrumentality. See 15 U.S.C.A. §§ 713, 714. As to the right of the Government to sue in such a situation in its own name, see Insurance Co. of North America v. United States, 4 Cir., 159 F.2d 699, 702, and cases there cited.

2. On argument in the trial court and here, the Government contended alternatively that, if the cost of its own terminal services could not properly be said to represent the amount of carrier overcharges involved, such overcharges would at least consist of the amount for which the carrier offered to furnish these terminal services separately to shippers on other traffic, as to which the services were not included in the tariff rate, such as they were on the export-grain shipments here involved.

3. We intend no implication that request and refusal are necessary as a basis for establishing carrier default in relation to an incident of service covered by a tariff. We mention the form of the allegation made here only because of the existence of the facts, previously pointed out, that Commodity Credit had its own terminal-services program and that the grain involved had been taken over and handled under that program, when it arrived in Port Arthur.

4. 49 U.S.C.A. § 16(3) (g) provides that "the term 'overcharges' as used in this section shall be deemed to mean charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the commission."

5. It should be noted that the claim here was not one for special damages from alleged breach, but merely one for the allowance or refund of the cost or value of the terminal services covered by the general tariff charge.

On appeal here, the Government first contends that the trial court erred in not granting it a recovery on the basis of overcharges having in fact been made by the carrier under the tariff itself. It says that, while the tariff in form purported to provide an integrated or unitary rate of 24½ cents for the line-hauling of such export grain from Kansas City and the furnishing of terminal services therefor at Port Arthur, 1½ cents of this composite amount actually represented a separable charge made by the carrier for the furnishing of the terminal services and was entitled to be so regarded in relation to the tariff rate.

It argues that this necessarily is demonstrated by the explanatory statement contained in the tariff that "Port Arthur, Texas elevator charges, as shown in Items Nos. 110, 115, and 125 of K.C.S. Lines Circular No. 32–H, I.C.C. No. 5132, for the handling of export grain from cars through the elevator to shipside, are included in the rate." Circular No. 32–H, referred to, purported to make available at Port Arthur, to the public generally, elevator facilities for the storage of grain and for the transfer of grain from railroad cars to ships, on the implied condition, however, of space being available in the carrier's elevator at the time, and with an express reservation also of the right by the carrier to permit owners or exporters, having grain already in the elevator and providing "ship room" therefor, to use the space so emptied by them for other grain which they at the time had standing in cars on port or inspection tracks, "in preference to grain belonging to other persons." Items Nos. 110, 115 and 125 of the Circular set out general public charges for these elevator facilities, respectively, of ¼ cent per bushel for cleaning and fanning, ¼ cent for turning, and 1 cent for unloading and loading, including storage for not exceeding 20 days. In relation to the storage of line-hauled export grain, however, such as was here involved, there was a provision that "free time allowance will be thirty days."

We think that there was ample basis for the trial court to view the situation as constituting legally, on its face, one in which (1) the 24½-cent rate represented an integrated or unitary charge for both transportation and terminal services on such export grain as was here involved; in which (2) the tariff could not from its language and context be said to have been intended to grant any deduction right or to fix any allowance amount, in the event that some shipper did not need or chose not to avail himself of all the included services, or in case all of the incidents of such services might not for other reason have been in fact rendered by the carrier; in which (3) the general declaration in the tariff that elevator charges, as shown in Circular No. 32–H, "are included in the rate" did not facially or contextually compel the conclusion as a matter of law that the terminal services constituted a mere mathematical factor or were included on a wholly separable value basis, in the componency of the total services provided for and normally required by such export grain, and as to which the tariff had fixed an integrated rate—this being particularly true as a matter of relationship to other facial aspects of the tariff such as that the carrier, in agreeing to provide terminal services as part of the transportational facilities for such export grain, was obligating itself to provide the services absolutely, and not on the contingent basis of the facilities being then available, to which the offer made of such services under Circular No. 32–H to other shippers or to the public generally was subject, and that other indication of the reference in the tariff to the Circular having been made primarily to denote the character and extent of the terminal services included was seemingly reflected in the statement of the tariff that, as to such export grain, "free time [storage] allowance will be thirty days;" in which (4) the Government's attempt therefore to obtain a deduction or allowance from the fixed tariff rate in relation to the terminal services amounted fundamental-

ly, under either of its purported causes of action, to a question simply of whether such a unitary rate ought transportationally to have been permitted to be fixed by the carrier without provision for a deduction or allowance in relation to the contingencies which have been referred to above, or whether some particular situation of less-than-full rendition by the carrier of all the services covered by the unitary rate, such as here, might on its circumstances make the rate an improper carrier charge in its transportational significance or relationship so as to call for a deduction or allowance, and, if so, in what amount; and in which (5) the transportational aspects involved in these questions made that matter wholly one for the cognizance of the Interstate Commerce Commission.

■■■■ It must be remembered that the courts are not entitled to engage in any semblance of rate-making whatsoever, either indirect or direct, such as attempting to put a value as such, for any purpose, on any aspect of carrier service, which a tariff does not make legally clear. Cf. Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472; Loomis v. Lehigh Valley R. Co., 240 U.S. 43, 36 S. Ct. 228, 60 L.Ed. 517. The courts may do no more in respect to carrier rates or charges than to read tariffs and give them effect as a matter of law. Thus, they are not even at liberty to examine into and evaluate divergent or equivocal extrinsic facts as a basis for getting at the meaning or the application of the language of a tariff. See Great Northern Ry. Co. v. Merchants Elevator Co., 259 U.S. 285, 291–292, 42 S.Ct. 477, 479, 66 L.Ed. 943. They have the right to deal with tariffs only as matter of reading the language thereof in its context and in relation to whatever other elements in the particular situation it is possible to accord significance to as a matter of law. Any other aspect of carrier charge or tariff application must under the statute be treated as a transportation matter, within the authority of

the Interstate Commerce Commission alone to resolve.

The Government contends, however, that, if the situation here was of this nature, the District Court should not have dismissed the suit but should have held the case in abeyance until a resort to the Interstate Commerce Commission could be made to have the matters thus involved administratively determined.

The court, in justifying its refusal to hold the case in abeyance, leaned principally upon the statement of the Supreme Court in Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 253, 71 S.Ct. 692, 696, 95 L.Ed. 912, that "In no instance have we directed a court to retain a case [involving questions for administrative resolution] in which it [the court] could not determine a single one of its vital issues." In viewing this statement as having controlling application to the present situation, the court said that, "In the instant case, regardless of the purported claims for breach and overcharge, such issues are obviously not severable from the question of reasonableness which, far from being subsidiary, permeates every legal facet of plaintiff's case", and, "in the absence of issues independent of the question of reasonableness, it would be inadvisable, if not improper, to hold judgment in abeyance pending determination of the administrative proceeding." [116 F.Supp. 490]

But the pleadings here show that the Railway was seeking to have the court deny a recovery upon other grounds also than the administrative questions which have been discussed. Thus, the Railway had set up the defense, among others, that all but approximately 2 per cent, at most, of the amount of the claim asserted was without any possible recovery basis under the bar of 49 U.S.C.A. § 16(3) (b) and (c). And the Railway had made the further defense, in effect, that, even if the tariff had fixed a separable value for the terminal services and had provided for or could be said to imply a right to an allowance of this amount, in the event

that the carrier "failed" or "neglected" to furnish such terminal services, the circumstances of non-rendition here involved would not fall within the scope of those terms, nor could the facts otherwise be regarded as amounting to a breach of carrier obligation in the situation.

Disposition of these issues by the court might perhaps have eliminated any need to have the administrative questions discussed above at all resolved by the Interstate Commerce Commission.[6] Moreover, if any part of the Government's claim should be found by the court to be outside the bar of the statute, and also to be incapable of being defeated by any of the other defenses raised, except those related to the administrative questions, it would seem that such public money as thus would be left involved would be capable of being protected only by a holding of the present action in abeyance and allowing the administrative questions to be submitted to the Interstate Commerce Commission for answer, on the basis of their incidence in the judicial proceeding. Any right to resort to the Interstate Commerce Commission as a matter of independent and plenary proceeding clearly would now be wholly barred, and the Commission could, and no doubt would, refuse on that ground to entertain any such complaint.

On these considerations, we think that the order of dismissal should be vacated and the cause remanded for such further proceedings, on the present record or otherwise, as the District Court may deem appropriate. We may add that the trend of the practice in the District Courts in recent years seems to be to hold judicial actions in abeyance, rather than to dismiss them, in which questions requiring resolution by administrative authority are presented, except where administrative jurisdiction and available remedy of such a nature exist and are exercisable at the time of the court's consideration, as to appear to be capable of ending the controversy, or except where the court otherwise can reasonably believe that no substantial legal or equitable purpose is likely to be served in the particular situation by a staying of the court's dismissal hand. See e. g. Ispass v. Pyramid Motor Freight Corp., D.C. S.D.N.Y., 54 F.Supp. 565; Berg v. Cincinnati, N. & C. Ry. Co., D.C.Ky., 56 F. Supp. 842; Keith Ry. Equipment Co. v. Association of American Railroads, D.C. Ill., 64 F.Supp. 917; Gross v. Missouri & A. Ry. Co., D.C.Ark., 74 F.Supp. 242; United States v. Railway Express Agency, D.C.Del., 89 F.Supp. 981; Apgar Travel Agency v. International Air Transport Ass'n, D.C.S.D.N.Y., 107 F. Supp. 706. See also Northern Pacific Ry. Co. v. United States, 8 Cir., 213 F.2d 366, 369; S. S. W. Inc., v. Air Transport Ass'n of America, 89 U.S.App.D.C. 273, 191 F.2d 658; City of New Orleans v. Texas & N. O. R. Co., 5 Cir., 195 F.2d 882; City of New Orleans v. Texas & Pac. Ry. Co., 5 Cir., 195 F.2d 887; General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 432–433, 60 S.Ct. 325, 84 L.Ed. 361. And note further the discussion contained in the dissenting opinion of Mr. Justice Frankfurter in United States v. Interstate Commerce Commission, 337 U.S. 426, 464–465, 69 S.Ct. 1410, 93 L.Ed. 1451. We should perhaps also say that we can see nothing in any of the Supreme Court decisions cited to us which seems to us to be in conflict with the views here expressed, as related to the circumstances of the present situation.

Judgment of dismissal vacated and cause remanded.

## On Petition for Rehearing.

The Railway Co. has rigorously assailed the views expressed in our opinion, upon the right of a court to hold an action in abeyance, as related to one against a carrier, under 49 U.S.C.A. § 9, "for the recovery of the damages for which such common carrier may be liable under the provisions of (Part I of the Interstate Commerce Act)", where there

---

6. We intend, of course, no intimation of any nature on any of the defenses referred to.

is involved a question which the Interstate Commerce Commission has primary jurisdiction to resolve, and which is foundational to the existence of the liability claimed.

We said in our opinion, after holding that the court ought not to have dismissed the action here, that "we can see nothing in any of the Supreme Court decisions cited to us which seems to us to be in conflict with the views here expressed, as related to the circumstances of the present situation." The petition for rehearing asserts that, instead, our views and holding are "contrary to all the decisions on this question." Such antipodal evaluation of the Supreme Court decisions might make desirable some enlargement of the summarical statement of our opinion.

Following the several defenses which it undertook to set up to the merits of the Government's claim generally, the Railway Co. had made the allegation, in the final paragraph of its answer to each count of the complaint, that the court was totally "without jurisdiction" of the action itself. The case was, however, tried and submitted to the court upon all of the issues raised by the pleadings. And in its memorandum opinion, the trial court took occasion to make the express declaration that "jurisdiction is present" and that the dismissal being made "was not for want of jurisdiction", but because of the court's view that "it would be inadvisable, if not improper, to hold judgment in abeyance pending determination of the administrative proceeding" (resort to the Interstate Commerce Commission for resolution of the administrative questions), since the action seemed to it to involve no issues which were "independent of the question of reasonableness."

We pointed out in our opinion that other questions had, however, been put in issue by the pleadings and submitted by the parties to the court on the trial had, and that "Disposition of these issues by the court might perhaps have eliminated any need to have the administrative questions * * * at all resolved by the Interstate Commerce Commission." And we added the observation that, in the event that the Government's claim was capable of surviving these other defenses, then the fact ought not needlessly to be ignored that what was involved was a claim for the return of public money, as to which the circumstances, such as the length of time that the action had been pending (the suit was filed on July 28, 1948, and the order of dismissal and refusal to hold in abeyance was made final on November 17, 1953), had left the situation where the Interstate Commerce Commission now was without any power under the statute to grant reparation relief in an administrative proceeding, and that the only way therefore that it presently was possible to safeguard such public interest as might be involved would be "by a holding of the present action in abeyance and allowing the administrative questions to be submitted to the Interstate Commerce Commission for answer, on the basis of their incidence in the judicial proceeding."

In its brief, here, the Railway Co. purportedly sought to renew the jurisdictional attack of its answer, with the statement in the body of the brief that "the many controlling cases we have cited * * * hold categorically that only the Commission has the power to act [at all] in a case like the one at bar." Thus, the initial question to which we were required to give consideration was —as jurisdiction always must be in any case—whether there at all exists any jurisdiction or authority, under 49 U.S. C.A. § 9, for the initiation or institution of a judicial action for reparations or damages against a carrier, when there is involved a foundational and undetermined administrative question as a basis for liability in the particular situation.

The statute itself, § 9, would not seem on its face to leave any doubt as to its unconditional grant of the right to make a choice, so far as the mere matter of instituting a proceeding is concerned, between the remedies of seeking damages (reparations) administratively or judicially, for any alleged violation by a car-

rier of the provisions of the Interstate Commerce Act. It provides: "Any person or persons claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person or persons shall not have the right *to pursue both of said remedies,* and must in each case elect which one of *the two methods of procedure* herein provided for he or they will adopt. \* \* \* " (Emphasis supplied).

 It should be noted in this connection that the Interstate Commerce Commission recognizedly has jurisdiction or power to resolve all administrative questions related to any possible violation by a carrier of the Act, not merely as a part of, but equally wholly apart from, its authority to grant reparations or the making of any request upon it for the awarding of such relief. Thus, as was recognized by the Court's opinion in United States v. Interstate Commerce Commission, 337 U.S. 426, 439, 69 S.Ct. 1410, 1418, 93 L.Ed. 451, under the statute a shipper would be entitled, for example, to submit to the Commission "only a question of the reasonableness of rates", or he might ask "for that administrative determination plus reparations." If he asks administratively for an award of reparations, he has, of course, made an election of recovery remedies, which leaves him thereafter without the "right to pursue" the remedy of judicial action as such.

This aspect was more fully commented on in some of the general discussion contained in the dissenting opinion of Mr. Justice Frankfurter in the case (the decision and the dissent were on the question of the right to a judicial review of an order of the Commission denying a claim made to it for ⌐eparations), as fol-

lows: "The Commission must often pass on the legality of a particular practice of a carrier; such proceedings may serve as the basis for reparations. Under Part I of the Transportation Act, relating to rail-carriers, the shipper may ask the Commission for a declaration that a practice has been illegal and base a claim of damages on such illegality under § 8 of the Act. His other course is to secure a Commission determination only as to the illegality of the practice and not ask for an award, reserving the claim of damages for court action. This may be done in one of two ways. He may begin by filing his suit in court and ask the court to hold the case until he has obtained an administrative determination from the Commission. There is no jurisdictional bar to such a procedure. \* \* \* The other method open to a shipper who desires to avail himself of the court remedy given by § 9 is to initiate proceedings before the Commission and to ask merely for a declaration regarding the legality of a past practice, but not for damages." 337 U.S. at pages 464–466, 69 S.Ct. at pages 1430–1431.

It is true that in the course of the majority opinion in that case the general statement was made that "it has been established doctrine since this court's holding in Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, that a shipper cannot file a § 9 proceeding in a district court where his claim for damages necessarily involves a question of 'reasonableness' calling for exercise of the Commission's primary jurisdiction." 337 U.S. at page 437, 69 S.Ct. at page 1417. But that question did not represent an issue in the case, and what the opinion thus incidentally declared can hardly properly, we think, be regarded as having been intended to be read out of context and relationship to the Court's various other decisions, in which the existence of jurisdiction to permit the institution of such a suit, and of the right to hold it in abeyance for an obtaining from the Commission of any necessary administrative an-

swers, seems to us to have been a matter of progressive recognition and definitely emerged trail.

The first expression of the Supreme Court upon the question was made in the Texas & P. R. Co. case, supra, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann. Cas. 1075. That case involved a suit brought by a shipper against a carrier, subsequent to the enactment of the Interstate Commerce Act, in a Texas state court, to recover back a part of the charge fixed by a tariff schedule, and paid by the shipper, on some carloads of cotton seed, under an allegation that the tariff rate was unreasonable, and with the action being predicated upon the theory of the Interstate Commerce Act having left surviving the right previously existing at common law, to sue a carrier for, and have a court pass upon, the impropriety or exorbitance of such carrier's exacted charges, and its degree, in relation to a particular situation.

The Court, on a review of a judgment of recovery granted by the Texas courts, reversed and remanded the case, but said, among other things, in an opinion written by Mr. Justice (later Chief Justice) White, that "we think that it inevitably follows from the context of the act that the independent right of an individual originally to maintain actions in courts to obtain pecuniary redress for violations of the act, conferred by the 9th section must be confined to redress of such wrongs as can, consistently with the context of the act, be redressed by courts without previous action by the Commission, and, therefore, does not imply the power in a court to primarily hear complaints concerning wrongs of the character of the one here complained of." 204 U.S. at page 442, 27 S.Ct. at page 356.

Within a few months, however, the Court was called upon to pass on another such case, Southern Railway Co. v. Tift, 206 U.S. 428, 27 S.Ct. 709, 51 L.Ed. 1124, 11 Ann.Cas. 846, in which a federal Circuit Court had allowed a suit, brought against a carrier for an injunction, to prevent a new and higher tariff rate formulated by the carrier from being carried into effect, to remain pending, until the shipper had resorted to the Interstate Commerce Commission to have the unreasonableness of the new rate determined and declared. An amended bill also was permitted to be filed and similarly to remain pending in the judicial proceeding, during the resort to but before any answer by the Commission on the question of unreasonableness. And when the Commission thereafter declared the new rate unreasonable, the shipper was allowed to seek reparations as one of the incidents in the proceeding so left pending and was granted both an injunction and an award of damages by the Circuit Court, which decree and judgment were upheld by the Circuit Court of Appeals and were in turn affirmed by the Supreme Court.

In the course of its opinion, the Supreme Court there said: "In the case at bar * * * there are assignments of error based on the objections to the jurisdiction of the circuit court. These might present serious questions in view of our decision in Texas & Pacific Railroad Company v. Abilene Cotton Oil Company, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, upon a different record than that before us. We are not required to say, however, that because an action at law for damages to recover unreasonable rates, which have been exacted in accordance with the schedule of rates as filed, is forbidden by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates or a change to unjust or unreasonable rates. The circuit court granted no relief prejudicial to appellants on the original bill. [It simply, as we have previously indicated, allowed that bill to remain pending.] It sent the parties to the interstate commerce commission, where * * * the decision was adverse to the appellants. This action of the Commission, with its findings and conclusions, was presented to the circuit court, and it was upon these, in effect, the decree of the court was rendered. * * * It

was certainly competent for the appellees to proceed in the circuit court under § 16 of the interstate commerce act [24 Stat. 379] and to apply by petition to the circuit court, 'sitting in equity,' for the court to hear and determine the matter 'as a court of equity,' and issue an injunction 'or other proper process, mandatory or otherwise,' to enforce the order of the Commission. We think that, under the broad powers conferred upon the circuit court by § 16 and the direction there given to the court to proceed with efficiency, but without the formality of equity proceedings, 'but in such manner as to do justice in the premises,' and in view of the stipulation of the parties, recited in the decree of the court, [that in case the complainants (appellees) prevailed, decree of restitution also might be made] the appellants are precluded from making the objection that the court did not have jurisdiction to entertain the petition and grant the relief prayed for and decreed." 206 U.S. at pages 437 and 438, 27 S.Ct. at page 711.

But if the Texas & P. R. Co. case, supra, was required to be read as holding that there was utterly no jurisdiction to even permit an action for reparations, on account of alleged unreasonable rates, to be instituted or initiated in court, until the Interstate Commerce Commission had first declared the charges to be unreasonable and illegal, and if the Court, in the Southern Railway Co. case, was intending to adhere to such a construction of the statute, then it would not have been possible for it, consistently or logically on the legislative language used, to have recognized any jurisdiction either, to permit a suit for injunction to be filed against such alleged unreasonable rates, or to allow that suit to remain pending, or, most of all, to use it as a basis for granting subsequent judicial relief, including reparations, when at the time the suit was instituted there similarly had been no foundational declaration by the Commission establishing the unreasonableness and illegality of the rates.

In fact, on the language of section 16, as then in force, 24 Stat. 384 and 385, 49 U.S.C.A. § 16, relating to injunction jurisdiction, it would impress that, if any difference at all existed, there was even less basis for recognizing any jurisdiction to permit the initiation of an injunction suit, the holding of that suit in abeyance, and the granting of subsequent relief through the channel thereof, than in the case of a suit for reparations under section 9, since section 16 contained definitive expression, not found in section 9, as to a court's injunctive power, declaring it to exist "whenever any common carrier * * * shall *violate or refuse or neglect to obey any lawful order or requirement of the Commission * * *."* (Emphasis supplied.)

Necessarily, on this language, the existence of an order or requirement of the Commission could hardly be said to be any less essential, as a foundation for a claim of violation or neglect to obey, than a declaration by the Commission of unreasonableness and illegality as to a carrier rate, rule or practice as a foundation for a claim of damages. And, of course, if a court actually was without jurisdiction or power under the statute to allow any such suit to be instituted or initiated, where no foundational order, requirement or determination by the Commission existed at the time, then there could be no basis to permit or to recognize any pendency of it, nor would it be possible for any stipulation or agreement of the parties to accord legal efficacy or vitality to it as an instrument for granting judicial relief in respect to the unjurisdictionally asserted claim. Only the existence of jurisdiction or power to allow the suit to be initiated and of legal right to recognize and permit it to remain pending, while resort was made to the Commission for answer to the administrative questions, would at all enable a court to use such a suit as a channel or basis for thereafter granting judicial relief on such a claim assertion. Hence the actual effect and inescapable implication of what the Court did in the

Southern Railway Co. case were, and only could be, to make a departure from the "no-jurisdiction" concept of the Texas & P. R. Co. case, despite the lack of any direct admission thereof in the opinion.

In its next opinion on the question, Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L. Ed. 1472, the Court again made an unmistakable though still not specifically admitted, legal retreat from the lack-of-jurisdiction concept of the Texas & P. R. Co. case. That was a suit brought by a shipper against a carrier for damages from discrimination, because of the making by the carrier, to other shippers of similar goods, of alleged unreasonable and preferential allowances, from the existing tariff rate, for services performed by such shippers in connection with the transportation. There had been no determination or declaration by the Commission that the allowances made were unreasonable or preferential as related to the services rendered by such shippers. The Circuit Court dismissed the suit, on the ground that it "had no jurisdiction of the cause of action until after the Interstate Commerce Commission had passed upon the legality of the allowances and the reasonableness of the amount paid to shippers for hauling cars between their mines and the station." See 230 U.S. at page 249, 33 S.Ct. at page 917. The Circuit Court of Appeals refused to review.

On writ of error, the Supreme Court ordered that qualification or modification of the dismissal should be made as follows: "But, owing to the peculiar facts of this case, the unsettled state of the law at the time the suit was begun, and the failure of the defendant to make the jurisdictional point in limine, so that the plaintiff could then have presented its claim to the Commission and obtained an order as to the reasonableness of the practice or allowance,—direction is given that the dismissal be stayed so as to give the plaintiff a reasonable opportunity within which to apply to the Commission for a ruling as to the reasonableness of the practice and the allowance involved; and, if in favor of the plaintiff, with the right to proceed with the trial of the cause in the district court, in which the defendant shall have the right to be heard on its plea of the statute of limitations as of the time the suit was filed, and any other defense which it may have." 230 U.S. at pages 266 and 267, 33 S.Ct. at page 924.

Here again it is incapable of legal dispute that, unless the Court was in fact abandoning the no-jurisdiction concept of the Texas & P. R. Co. case, there was no way that it could have modified the dismissal order and have required the trial court's hand to be stayed, for the permitting of a resort to the Commission by the plaintiff on the administrative question. Certainly, if the statute granted no jurisdiction to allow an action, based on a charge of unreasonableness and illegality, such as in that case and here, to be judicially instituted and held in abeyance, while resort could be made to the Commission for answer upon the question of unreasonableness and illegality, then neither special circumstances, failure to make immediate jurisdictional objection, nor anything else could afford a basis for recognizing and upholding such jurisdiction as to a particular situation.

And so, as we have suggested in relation to the Southern Railway Co. case, supra, the actual effect and inescapable implication of the Mitchell Coal and Coke Co. case also were to constitute a retreat by the Supreme Court from the concept that the statute does not grant any jurisdiction or authority to allow a judicial action for damages or reparations to be instituted against a carrier and held in abeyance, when there is involved a foundational and undetermined administrative question as a basis for liability in the immediate situation. In fact, the Court's manifest understanding and intent that this was what it was doing would seem to be reflected by this restatement of the rule which it made in the opinion, as follows: "Section 9 gives the plaintiff the option of going before the

Commission or the courts for damages occasioned by a violation of the statute. But since the Commission is charged with the duty of determining whether the practice was so unreasonable as to be a violation of the law, the plaintiff must, *as a condition to his right to succeed* [not to his right to institute an action], produce an order from the Commission that the practice or the rate was thus unreasonable and therefore illegal and prohibited." (Emphasis supplied.) 230 U.S. at page 257, 33 S.Ct. at page 921.

In the case of Morrisdale Coal Co. **v.** Pennsylvania R. Co., 230 U.S. 304, 33 S. Ct. 938, 57 L.Ed. 1494, decided concurrently with the Mitchell Coal and Coke Co. case, the Court still further gave implicit recognition to the general right under the statute of a shipper to institute an action for damages and have it held in abeyance, while resorting to the Commission for answer on the question of unreasonableness and illegality, when it considered and discussed the shipper's request in that case to have the trial court's dismissal vacated and the suit held in abeyance. It refused, however, to take such action in the particular situation, because, at the time the suit was instituted, the shipper could not alternatively have sought reparations from the Commission. The Court had not at that time held that the limitation of the Interstate Commerce Act for seeking reparations from the Commission was also equally applicable to a judicial action, as it later did in A. J. Phillips Co. v. Grand Trunk Western Ry. Co., 236 U. S. 662, 35 S.Ct. 444, 59 L.Ed. 774. A footnote to the opinion in General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 433, footnote 15, 60 S.Ct. 325, 331, 84 L.Ed. 361, (which case will be next discussed herein) referred to the Court's holding in the Morrisdale Coal Co. case as having involved a situation "where no rights could be saved by retaining the cause."

In General American Tank Car Corp. v. El Dorado Terminal Co., just referred to, the practice of holding actions generally in abeyance, pending the resolution of an administrative question resting within the Commission's primary jurisdiction, was given unstinted recognition and approval as follows: "When it appeared in the course of the litigation that an administrative problem, committed to the Commission, was involved, the court should have stayed its hand pending the Commission's determination of the lawfulness and reasonableness of the practices under the terms of the Act. There should not be a dismissal, but, as in Mitchell Coal & Coke Co. v. Pennsylvania R. Co., supra, the cause should be held pending the conclusion of an appropriate administrative proceeding." 308 U.S. at page 433, 60 S.Ct. at page 331.

The case was not a suit for reparations under the statute, but one to recover a sum alleged to be due under the terms of a car-leasing agreement, the payment of which as such the defendant claimed in defense would amount to the making of a rebate, in violation of the Elkins Act, 49 U.S.C.A. § 41 et seq. But it also properly may be noted that the statement in the opinion purported to make no distinction between reparation suits and other suits, in respect to the right to hold and commit the administrative problem to the Commission, and that the case which it cited, in precedent and warrant of its discussion and direction as to holding in abeyance, was the Mitchell Coal & Coke Co. case, supra, where the question of "reasonableness" was a threshold matter.

Still further, in Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132, where a carrier sought, by action in the Texas state courts, to recover, on an alternatively asserted right basis, damages from the trustee of another railroad, then in reorganization, for the use made by such trustee of part of the plaintiff-carrier's tracks and other facilities, and where the Texas courts had granted such a recovery, the Supreme Court, in reversing, held that the question of what amount the trustee properly should pay for the use of such trackage and facilities, in the

absence of any existing and valid agreement, constituted transportationally a question of reasonableness for the primary jurisdiction of the Interstate Commerce Commission, but that the trial court should hold the case in abeyance pending resort to and action by the Commission.

Other issues also had been attempted to be raised in that case, which equally were matters of primary jurisdiction in the Commission. All of these questions, including that of the reasonableness of such allowance as the plaintiff might be entitled to for the use made of its tracks and other facilities, were covered together and without differentiation in the Court's conclusionary statement as follows: "Thus, however the case may be viewed, the court below should have stayed its hand and remitted the parties to the Commission for a determination of the administrative phases of the questions involved. Until that determination is had, it cannot be known with certainty what issues for judicial decision will emerge. Until that time, judicial action is premature. The judgment will be reversed and the cause remanded so that the case may be held pending the conclusion of appropriate administrative proceedings." 328 U.S. at page 151, 66 S. Ct. at page 947. Once more, it is entitled to be emphasized that, if a court is without any jurisdiction to permit an action involving a question of "reasonableness" to be instituted and held in abeyance, then the phase of the case related to the fixing of a reasonable amount for the use of the track and other facilities involved could not properly have been, ordered held in abeyance.

On all of this, we are unable to see any present room to continue to contend that a court is without jurisdiction to allow an action for damages or reparations to be instituted and to permit it to remain pending, merely because it involves a question of reasonableness which must be referred to the Interstate Commerce Commission for administrative answer. Rather, it seems plain to us that the decisions which have been reviewed above authorize and contemplate the dealing by a court with such an action in the manner that will best serve the cause of justice in the particular situation—the same as is done generally in all other judicial actions, where questions are presented, whether initially or intermediately, which require answer by administrative authority, before it is possible for a court to grant relief, such as United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211; Addison v. Holly Hill Fruit Products Co., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488, 153 A.L.R. 1007; et cetera.

Of course, in any of such cases, where it appears that no protective or other useful purpose is likely to be served by holding the suit in abeyance, pending resort to administrative authority for any necessary answers, the court may exercise its discretion to dismiss, as was done in Far East Conference v. United States, 342 U.S. 570, 576–577, 72 S.Ct. 492, 495, 96 L.Ed. 576, where the Supreme Court said: "We believe that no purpose will here be served to hold the present action in abeyance in the District Court while the proceeding before the (Federal Maritime) Board and subsequent judicial review or enforcement of its order are being pursued. A similar suit is easily initiated later, if appropriate."

The present situation is not one of that nature. On the facts, as set forth in our original opinion, it cannot be claimed that the case is one "where no rights could be saved by retaining the cause", 308 U.S. at page 433, 60 S.Ct. at page 331; or where, even if no protective aspect (and here as to public money) had been involved, there was presented no issue beyond the matter of the administrative question, Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, at page 253, 71 S.Ct. 692, 95 L.Ed. 912; or where, if there exists any basis to contend that the Supreme Court decisions are not entitled to be read as we have done above, but require the construction for which the Railway Co. argues, it cannot properly be said that there was not at least

an "unsettled state of the law at the time the suit was begun," 230 U.S. at page 266, 33 S.Ct. at page 924.

In conclusion, reiteration also may be made of the statement in our opinion, that an examination of the practice in the District Courts will, we think, show an established trend toward the holding of any such actions in abeyance, rather than to dismiss them, unless there exists an adequate, exercisable administrative remedy at the time of the court's consideration, or unless, even though no adequate administrative remedy may exist, it otherwise seems unlikely that in the particular situation any useful purpose can substantially or directly be served by a staying of the court's dismissal hand.

The petition for rehearing is denied and mandate will forthwith be issued.

COLLET, Circuit Judge (dissenting).

Upon further consideration of this cause on petition for rehearing, I am convinced that there is no justification for an order by this court remanding this case in order that it may be held until the Interstate Commerce Commission decides the transportation question, i. e., whether the rate charged (which is concededly the legal rate on file) is severable and, if so, what part of it represents the value of the service which the plaintiff-appellant did not ask for or receive. That is a question which the trial court has no jurisdiction to entertain. Therefore, to order the trial court to hold this case until the Interstate Commerce Commission has determined it amounts, in effect, to ordering the trial court to hold the case and enter such judgment as the Interstate Commerce Commission dictates, without the exercise of any judicial function by the court. And to do so would preclude the statutory review of an Interstate Commerce Commission reparation order.

The fact that, as stated in this court's opinion, an independent reparation action before the Interstate Commerce Commission for the relief now sought in the courts may be barred by limitations should not justify the order of remand.

To adopt that reason for holding the case awaiting action by the Interstate Commerce Commission would countenance the circuitous avoidance of the statute of limitations by the filing of an action in the courts for relief which should have been instituted before the Interstate Commerce Commission.