Annunzio M. SOMMA

v.

UNITED STATES of America.

Civ. A. No. 22615.

United States District Court
E. D. Pennsylvania.

Jan. 22, 1960.

Pershing N. Calabro, Philadelphia, Pa., for plaintiff.

Walter E. Alessandroni, U. S. Atty., Charles M. Donnelly, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

In this action for damages, as a result of hospitalization, convalescence and resulting losses alleged to have been caused by the defendant's negligence in failing to detect and warn the 43 year old plaintiff of evidence of tuberculosis on x-rays taken in 1954, 1955, and 1956,[1] plaintiff testified that x-rays had been taken of his chest approximately once a year from 1940, when he started to work as a civilian for the Navy, to 1954 and thereafter about every six months (N.T. 10–11). The following x-rays, taken prior to the hemorrhaging on May 29, 1956, which caused plaintiff's hospitalization, were offered in evidence as showing some evidence of active tuberculosis:[2]

| Date | Film | Finding |
|---|---|---|
| 11/19/52 | 70 mm. film of TB. Assn.[3] (D-3) (downtown Phila.— probably 19th & Walnut Streets) | Slight abnormality at top of right lung |
| 12/17/52 | 14 x 17 film of TB. Assn. (D-4) (downtown Philadelphia) | A spot, highly suspicious of TB. |
| 3/ 2/54 | 70 mm. film of TB. Assn. (D-7) (downtown Phila., probably 19th & Walnut Streets) | Possibly some increase in the abnormality shown in D-3 (see D-11) |
| 4/19/55 | 14 x 17 film of Phila. Navy Yard (P-10) | Lesion above first rib— shows minimal TB. |
| 10/21/55 | 14 x 17 film of Phila. Navy Yard (P-10) | Irregular cavity for first time below first rib & first evidence of moderately advanced TB. |
| 3/26/56 | 35 mm. film of Burge Clinic (19th and Walnut Streets) | "Increased density right upperlobe level right 1st rib and 1st interspace anteriorly. Reinfection type (adult type) tuberculosis a possibility" (P-9) |

---

1. It is unnecessary to decide defendant's claim that there is no right of action under the Federal Tort Claims Act (28 U.S.C.A. § 1346, relied on in paragraph 1 of the Complaint) for the reasons stated in this opinion.

2. The testimony concerning these x-rays of Dr. Sokoloff impressed the trial judge more than that of the other doctors and it forms the basis of this chart (N. T. 326 ff. & D–11).

3. The full name of this Association is Philadelphia Tuberculosis and Health Association.

When plaintiff reported for the x-ray in November 1952, he furnished the name and address of Dr. Dante Bevilacqua as his family physician and this was added to the basic information previously typed on the TB. Association card (see P-1A).

After the x-ray of 11/19/52 had been taken, the TB. Association notified the local Navy doctor that the larger, 14 x 17 films should be taken of approximately 30 civilian Navy employees, including the plaintiff, "in order to establish a definite status" (P-1B). The larger, 14 x 17 x-ray of plaintiff's chest was taken on 12/17/52 (D-4) and on 12/23/52 a report was sent to the local Navy doctor (P-1C, page 4). On 12/24/52 an almost identical report, reading as follows, was sent by the TB. Association to his family physician, Dr. Bevilacqua (D-5):

"The left lung is normal. On the right side, behind the first interspace, behind the hilum is what appears to be tuberculosis infiltration. If the patient has cough and expectoration sputum examination for tubercle bacilli should be made."

Plaintiff reported to Dr. Bevilacqua as a result of this December 24 report on December 26, 1952 (N.T. 407 & C-2).[4] This doctor testified (N.T. 407–9):

"* * * an x-ray at the Naval Base showed some suspicious markings, and on examination his chest sounds were clear, there were no rales, there was no evidence of any night sweats, temperature, loss of appetite, or loss of weight, and I advised the patient to have a sputum analysis.

*   *   *   *   *   *

"* * * I told Mr. Somma to collect his sputum for a period of 24 hours—over a period of 24 hours and bring it in to me, and I do recall Mr. Somma bringing the sputum in to me on a Monday morning.

"The Court: Is there anything else on the card?

"The Witness: Yes. On the 30th it showed that the sputum analysis was negative for any Koch infection, tubercular infection.

*   *   *   *   *   *

"I called Mr. Somma on the telephone, if I recall. I think it was on New Year's Eve, and—as soon as I got the results, I called Mr. Somma on the telephone. I told him the news about the analysis of the sputum."

Dr. Bevilacqua testified that "plaintiff was very apprehensive at the time. * * * He was concerned about this condition" and he "knew of this suspicion when he came in" (N.T. 410).[5] For a year and a half after this (N.T. 412), Dr. Bevilacqua saw Mr. Somma on several occasions at his home, when "the suspicious lung condition * * * was talked about now and then, but, * * * there was nothing ever done about it, because he never complained about anything" (N.T. 413). Since plaintiff told his doctor that he was making no com-

4. The plaintiff's testimony was proved to be inaccurate in several respects and the trial judge finds his testimony, that he went to see his family doctor on December 26 about his toe (N. T. 11), was inaccurate. Plaintiff testified that a Navy Department nurse told him to go see the doctor (N. T. 50), but his Navy medical card, which was offered to prove this, showed a "sore toe" on December 29 of an unidentified year (P–14), which would have been 3 days after the December 26 visit even if the year had been 1952. At N. T. 48, he admitted that his recollection of the facts might not be so good. At N. T. 13, he testified that he was a blood donor once or twice a year during the years 1953–1956, but the record card (D–2) and testimony (N. T. 130) show that he only gave blood once (on 1/5/54) during these four years.

5. The trial judge rejects plaintiff's testimony that he was not "upset" when he went to see his doctor (N. T. 55), even though he had had two x-rays within a period of about one month, and that "he was never given a report as to the result of the x-rays" (N. T. 11). The trial judge believes that Dr. Larkin discussed this spot on the lung with plaintiff early in 1957 (N. T. 138–9, 144).

plaints, Dr. Bevilacqua sent a negative report to the TB. Association on February 4, 1954, when that Association asked for additional data (D–8). After the visit of December 26, 1952, plaintiff never made another professional visit to his doctor concerning this condition or asked his doctor to examine him at his home or elsewhere (N.T. 408 and 56).

Although plaintiff admits his family doctor told him about "a suspicious spot * * * in my lung" (N.T. 50), he "never" mentioned to any persons giving him a chest x-ray in the future that he had a suspicious spot on his lung (N.T. 57). He only gave the name of his family physician at one x-ray examination (N.T. 57).

On March 2, 1954, he was again given a 70 mm. chest x-ray by the T.B. Association.[6] In April 1955 and November 1955, he was sent to the Navy Yard for large (14 x 17) x-ray films.[7] The nurse at the Navy Department office (19th and Walnut Streets, Philadelphia), where plaintiff and approximately 500–600 other employees who received x-rays (N.T. 34) worked, testified that when a person's case was significant enough to require a 14 x 17 x-ray, he was usually sent to the Philadelphia Navy Yard for such x-ray every six months (N.T. 106–7). All the employees at 19th and Walnut Streets were never sent to the Philadelphia Navy Yard (N.T. 107), but only about 18 (of which plaintiff was one) were singled out for the special treatment of having a 14 x 17 x-ray taken every six months at the Navy Yard (N.T. 142).

During the fall and winter of 1955–1956, plaintiff was busy and tired from a lot of running around between floors at 19th and Walnut Streets and the relatively long trip from his New Jersey home to his place of employment in Philadelphia (N.T. 14, 56 & 66–67). He had a prolonged cold and cough, which was a little more persistent than usual (N.T. 55–6 and 68).

In March 1956, plaintiff and all the other employees at the Navy Department office at 19th and Walnut Streets received chest x-rays conducted on a charitable basis by the Burge Clinic. At this x-ray, plaintiff was furnished a card with a place to indicate the name of his family physician (D–9), when he entered the room where the x-ray machine was located (N.T. 393, 403, 444).[8] At that time, his family physician was Dr. Ru-

6. Although this x-ray was improperly read by the T.B. Association as showing improvement in the lesion in the right upper lobe (compare P–1D and P–1 with D–11), there is no evidence that this reading was ever communicated to plaintiff (see N. T. 11). In a letter of 3/12/54 from the T.B. Association to the Navy Department, plaintiff's case was classified as "Significant—Do Not Require 14 x 17 Films" (page 2 of P–1D).

7. This entry was made in the Navy Department records (P–2 and P–5) after comparison of this film (P–10) with the December 1952 film (D–4):

"Comparison of the film of 4–19–55 with one taken 12–17–52, reveals this process to be of long duration, gradual healing and the sputum being negative. Feel that we can re-x-ray this patient in six (6) months and be safe."

As indicated above, these films show minimal and moderately advanced tuberculosis, respectively. The 1955 films showed a progression in the disease which was not evident to the Navy personnel reading the 1955 films.

8. The technician testified that she put up a sign in a prominent place in the x-ray room, asking each person to give notice of his or her family physician if they wished such a physician to receive a copy of the x-ray report (N. T. 398 and 401–2). Plaintiff testified that he did not see a sign but that the card (D–9) was handed to him by the nurse when he entered the conference room in which the x-ray machine was located and he had it until he received his x-ray, when he gave it to the technician (N. T. 426–7, 429–30). Mrs. Schmidt testified that there was a general announcement, while she was in the room where the x-ray machine was, informing all persons to insert the name of the family doctor if they wanted him to receive a copy of the chest x-ray (N. T. 466–7). Another employee testified that he gave the name of his family doctor after asking the technician if it was permissible to have the results of the x-ray sent to his family doctor (N. T. 470, 473–4).

pert Hughes (N.T. 15), but he failed to write the name of this physician on the card or to furnish it to the technician or other personnel present so that it could be placed on the card. At least six other persons examined at that time furnished the names of their family physicians and this information appears on their cards ( (D–13 (3 cards dated 3/23/56) and D–14 to D–16) ).[9] The policy of the Burge Clinic was always to send the x-ray report to the family physician if his name was furnished on the card (N.T. 285–6, 474). The complete report [10] of the Burge Clinic concerning plaintiff was (P–9):

> "Increased density right upper-lobe level right 1st rib and 1st interspace anteriorly. Reinfection type (adult type) tuberculosis a possibility. Suggest immediate further study and if Vollmer tuberculin patch test reaction is positive, advise treatment and 35mm x-rays on all home contacts."

The Navy Department representatives scheduled plaintiff for a larger, 14 x 17 x-ray at the Navy Yard upon receipt of this report, but the Navy Yard x-ray machine was out of operation due to replacement by a new machine in April and May of 1956 so that this larger x-ray had not been taken prior to the above-mentioned incident on May 29 leading to plaintiff's hospitalization.

Under these circumstances, plaintiff's failures (a) to go to either of his family doctors between January 1953 and May 1956 for examination with respect to his lung condition, particularly in spite of his being one of a few persons who were sent to the Navy Yard every six months in 1955 and his tired feeling, as well as his cold and cough in late 1955 and early 1956, and (b) to furnish the name of his family doctor at the time of the March 1956 x-ray examination constituted negligence on his part and contributed in some degree to the incident of May 29, 1956, and the damages which he claims in this suit. Since the x-ray report was sent and an examination by the family physician conducted within ten days of the taking of the x-ray in 1952, when plaintiff furnished the name of his family physician (see P–1A), there is every reason to believe that Dr. Hughes would have examined him and discovered his active tuberculosis by mid-April 1956 if he had furnished the name of his family physician for inclusion on D–9.[11]

The Supreme Court of Pennsylvania has repeatedly held that when a person's bodily welfare is at stake, the "rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done (by a plaintiff), regardless of difficulties or expense." See Glancy v. Meadville Bread Co., 1941, 340 Pa. 452, at page 456, 17

---

9. Miss Perrini (now Mrs. Ellen Schmidt) testified that the first name of her doctor appears in her handwriting on D–14, and she furnished the last name and address which was inserted on the card (N. T. 465–7). There were also received in evidence four additional cards used during the Burge Clinic Survey 56 (which was the survey of the employees at the Navy Department's 19th and Walnut Street office in March 1956) having the names of family physicians (see 4 cards bearing numbers 87023, 87024, 87047 and 87048 in D–13) on them. These cards have a line through the March date on them and a May date inserted on top of it, which might indicate that those employees were not available for x-ray in March and received their x-rays in May.

10. Only the first two sentences of this report are quoted above at page 2.

11. It is noted that the failure to furnish the name of the family physician (Dr. Hughes—N. T. 15) in March 1956 on D–9 resulted in plaintiff's aggravating his tired condition by two months extra work, and this inaction after April 1955 clearly contributed in some part to the incident of May 29 and the resultant damages, which answers this argument at page 5 of plaintiff's Supplementary Brief (Document No. 21):

> "In the case at Bar, if contributory negligence is to be considered, it must be considered only from April 19, 1955 on, for no claim is made for antecedent aggravation, but only for aggravation commencing with the negligent conduct (acts of omission or commission) from that day on."

A.2d 395, at page 397. On the same page, the court said in the Glancy case, supra:

> "When a person omits to use his senses and walks thoughtlessly into a place of danger, he is guilty of negligence, and this contribution to his own injuries deprives him of any right to demand compensation from others who contributed to it."

See, also, Good v. City of Pittsburgh, 1955, 382 Pa. 255, 261–262, 114 A.2d 101,[12] and cases there cited.

Also, the Supreme Court of Pennsylvania has stated consistently that a plaintiff cannot recover if his negligence, however slight, contributed in any degree whatever to the injury. See Crane v. Neal, 1957, 389 Pa. 329, 332–333, 132 A.2d 675; Middleton v. Glenn, 1958, 393 Pa. 360, 363, 143 A.2d 14. In the Crane case, supra, the court reaffirmed the following language at pages 332–333 of 389 Pa., at page 677 of 132 A.2d:

> " * * * 'There is not the slightest doubt [under the law of Pennsylvania] that a plaintiff is guilty of contributory negligence and cannot recover if his negligence contributed in any degree, however slight, to the injury: * * *.' "

In the Middleton case, supra, the court said at page 363 of 393 Pa., at page 16 of 143 A.2d: " * * * that the plaintiff cannot recover if his negligence, however slight, contributed to the injury."

■ Although no Pennsylvania appellate court case has been discovered by counsel or the trial judge which is similar to this case, since there is no finding here of failure of plaintiff to comply with a direction of his doctor, it is clear that, even though defendant was negligent (which is assumed and would appear most probable[13]), under the Pennsylvania cases the plaintiff is not entitled to recover if any negligence of his with regard to his health contributed in even slight part to the incident of May 29, 1956, and the damages resulting therefrom. See Potter v. Warner, 1879, 91 Pa. 362,[14] where the court said at page 367:

> "The learned judge failed to give due legal effect to contributory negligence of the defendant in error. It is true the plaintiff in error was charged with negligence and unskilfulness. Although guilty thereof, yet it did not necessarily follow that he was liable in damages therefor. If the contributory negligence of the defendant in error united in producing the injuries complained of he was not so liable. This rule applies to the unnecessary pain and protracted illness as well as to the permanent deformity of the limb. The evidence is amply sufficient to submit to the jury the question of contributory negligence on the part of the defendant in error. * * * If the injuries were the result of mutual and concurring negligence of the parties, no action to recover damages therefor will lie. A person cannot recover from another for conse-

12. In this case, the court used this language at pages 261–262 of 382 Pa., at page 104 of 114 A.2d:
"As § 463 of the Restatement, Torts, defines it, 'Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant in bringing about the plaintiff's harm.' See, also, Kovalish v. Smith, 357 Pa. 219, 222, 53 A.2d 534. Contributory fault may stem either from a person's careless exposure of himself to danger or, as here, from his failure to exercise reasonable diligence for his own protection: see Restatement, Torts, § 466."

13. See United States v. Reid, 5 Cir., 1958, 251 F.2d 691, 695.

14. The following statement of the law appears at both 48 C.J. 1134 (§ 130) and 70 C.J.S. Physicians and Surgeons § 51a:
"Even though no instructions are given the patient, he is required to exercise such ordinary prudence as would be expected of a person situated in his condition, and a failure on his part to exercise this prudence will prevent recovery."
Cf. 50 A.L.R.2d 1044.

quences attributable in part to his own wrong."

■ Plaintiff's argument that he was entitled to rely on the Navy Department to advise him of the status of his tuberculosis condition, even though he was advised of the spot on his lung in December 1952, is contrary to the Pennsylvania rule that no person in full possession of his senses is justified in relying solely on the watchfulness of another or others for his own safety, even though the law imposes a duty on them to warn of latent dangers known to them. See Hoffner v. Bergdoll, 1933, 309 Pa. 558, 565–566, 164 A. 607; Bartek v. Grossman, 1947, 356 Pa. 522, 525–527, 52 A.2d 209; Bream v. Berger, 1957, 388 Pa. 433, 130 A.2d 708; Sloss v. Greenberger, 1959, 396 Pa. 353, 355–356, 152 A.2d 910; and cases cited in those cases.

■ The Government contends that the plaintiff cannot recover under the Federal Tort Claims Act, 28 U.S.C.A. § 2674, because his claim comes under the Federal Employees' Compensation Act, 5 U.S.C.A. § 751 et seq. (hereinafter "FECA"). It is settled that if the Government is liable to the plaintiff under the FECA for the injuries alleged, his remedy under that statute is exclusive and he cannot proceed against the United States in any other manner. 5 U.S.C.A. § 757(b); Johansen v. United States, 1953, 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051; Patterson v. United States, 1959, 359 U.S. 495, 79 S.Ct. 936, 3 L.Ed.2d 971. However, a very difficult question is presented as to whether the FECA applies to the injuries alleged to have been sustained by the plaintiff in this particular case.

■ Questions as to the scope and meaning of the FECA rarely come before the courts. All claims under this Act are handled by an administrative body and there is no judicial review of the Commission's decisions. 5 U.S.C.A. § 793; Hancock v. Mitchell, 3 Cir., 1956, 231 F.2d 652; Blanc v. United States, 2 Cir., 1957, 244 F.2d 708, certiorari denied 1957, 355 U.S. 874, 78 S.Ct. 126, 2 L.Ed. 2d 79; Calderon v. Tobin, 1951, 88 U.S. App.D.C. 134, 187 F.2d 514, certiorari denied 341 U.S. 935, 71 S.Ct. 854, 95 L.Ed. 1363. Therefore, the courts are only called upon to interpret and apply the FECA on the infrequent occasions when it is raised collaterally such as this.[15] On the other hand, because of their constant contact with the Act and claims filed under it, the compensation authorities are acutely aware of the problems involved, are more cognizant of the ramifications of any interpretation dealing with the scope of the Act, and have acquired valuable experience in this field. Thus, while the courts must not abdicate their decision-making function when it involves this particular area of the law, they should give great weight to any decisions by the administrative agency which is better equipped to determine and apply the policies Congress had in mind when it enacted the FECA.

Unfortunately, Mr. Somma has not endeavored to obtain compensation for his injury under the FECA. Two cases cited by the Government, Matter of Dombach, 8 E.C.A.B. 389 (1959), rehearing denied, 8 E.C.A.B. 581 (1956), and Matter of Knowles, 6 E.C.A.B. 180 (1953), are helpful on the question as to whether the plaintiff's alleged injuries were "sustained while in the performance of his duty" (5 U.S.C.A. § 751(a) ), but not on the more difficult question as to whether he suffered an "injury" within the meaning of the FECA (5 U.S.C.A. § 790(g) ).[16] Furthermore, we do not

15. The courts do come in frequent contact with analogous federal compensation acts such as the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., but the considerations are not altogether the same and an application of the principles evolved in this area of the law without a full appreciation of the special problems presented by the FECA would be unwise.

16. Cf. Tourville v. United Aircraft Corporation, D.C.D.Conn.1958, 177 F.Supp. 767, affirmed 2 Cir., 1957, 262 F.2d 570, involving a Connecticut compensation act,

know on what grounds the Commission denied relief in the somewhat comparable situation presented in Reid v. United States, 5 Cir., 1955, 224 F.2d 102, relied on by the plaintiff. It may not have turned on the application of the Act to the claim, but rather upon a defect in the procedure followed or a deficiency in the proof of the claim. Therefore, we are not favored with any expression of their views on this question.

The matter is further complicated by the possibility that the Commissioners might not agree with this court should it dismiss the suit on the ground that the plaintiff has a claim under the FECA. Plaintiff might, therefore, be left remediless because of conflicting decisions by two arms of the Government, with no review of the Commission's decision available.

Under these circumstances, it seems that the most prudent course for this court to follow would be to refrain from expressing an opinion on this point, but to state that if the finding and legal

conclusion of contributory negligence barring the action should be set aside,[17] the case will be stayed until the plaintiff has pursued his remedies under the FECA.[18] Cf. Federal Maritime Board v. Isbrandtsen Co., 1958, 356 U.S. 481, 496–499, 78 S.Ct. 851, 2 L.Ed.2d 926; General American Tank Car Corp. v. El Dorado Terminal Co., 1940, 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361; 3 Davis, Administrative Law Treatise, §§ 19.01, 19.07 (1958).

All Requests for Findings of Fact and Conclusions of Law which are inconsistent with the foregoing are denied.[19] Defendant's Requests for Conclusions of Law (Document No. 18) numbered 9 and 10 are adopted as Conclusions of Law of the court in addition to the foregoing.

### Order

And now, January 22, 1960, it is ordered that judgment shall be entered for the defendant, United States of America, and against the plaintiff, Annunzio M.

---

and other cases involving various state and federal statutes cited at pages 1–5 of Supplementary Brief on Behalf of Defendant (Document No. 24).

17. Because of this court's view on the issue of contributory negligence, it would seem unwise to follow the alternative course of staying this action at this time to enable the plaintiff to file a claim under the FECA in order to obtain the benefit of the Commission's views on this matter.

18. While it is not clear that plaintiff has satisfied the notice and written claim requirements within the prescribed periods (5 U.S.C.A. §§ 765, 768, 770), it would seem that this is an appropriate situation for the Secretary to waive compliance with these provisions, as authorized by 5 U.S.C.A. § 770, since five years have not elapsed since the injury, plaintiff has an excuse based upon a determination of his rights through a reasonable interpretation of the law, and the Government has not been prejudiced but, indeed, urges that a claim under the FECA would be the proper course. See, also, the letter of October 1956 (P–12) in which plaintiff made known his intent to make a claim against defendant.

19. It may be helpful for the trial judge to state that he would deny plaintiff's Requests for Findings of Fact 1, 6, 7, 21, 23, 29 and 36, among other Requests, and that he would affirm defendant's Requests for Findings of Fact 18, 20, 24, 25, and 27, among other Requests. The regulations of the Navy Department (see Section 3–4(e), as revised from time to time, in C–1), provided only that the employee was to be advised to seek treatment, if 14 x 17 x-rays proved his case "to be active." The incorrect readings of some of plaintiff's 14 x 17 x-rays, as shown on P–2, never showed "active" tuberculosis after January 1953 and the trial judge finds that he was advised of the condition disclosed by the December 1952, 14 x 17 x-ray. These regulations did not justify blind reliance on his part that 14 x 17 x-rays would be immediately taken under the cases cited at page 11 above. There was no negligence on the part of the Navy Department in replacing its x-ray machine at the Philadelphia Navy Yard in April and May 1956 and, hence, it was not at fault in failing to have a 14 x 17 x-ray taken between the time of the report received from the Burge Clinic (P–9) and the incident of May 29, 1956.

Somma, with costs, without prejudice to plaintiff's right to proceed for compensation under the Federal Employees' Compensation Act, 5 U.S.C.A. § 751 et seq.