**472**

WORLD COMMUNICATIONS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION, United States
of America, Respondents,

Communications Satellite Corporation,
New Valley Corporation,
Intervenors.

WORLD COMMUNICATIONS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION, United States
of America, Respondents,

New Valley Corporation, Intervenor.

Nos. 92–1435, 92–1550.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 7, 1993.

Decided April 8, 1994.

Robert E. Conn, Washington, DC, argued the cause and filed the briefs for petitioner.

James M. Carr, Counsel, Federal Communications Commission, Washington, DC, argued the cause for respondents. With him on the brief were Renee Licht, Acting Gen. Counsel, Federal Communications Commission, Daniel M. Armstrong, Associate Gen.

Counsel, Federal Communications Commission, John E. Ingle, Deputy Associate Gen. Counsel, Federal Communications Commission, Anne K. Bingaman, Asst. Atty. Gen., U.S. Dept. of Justice, and Catherine G. O'Sullivan and Andrea Limmer, Attys., U.S. Dept. of Justice.

Philip V. Permut Washington, DC and Susan I. Littman, Upper Saddle River, NJ filed the brief for intervenor, New Valley Corp. Diane Zipursky, Washington, DC, entered an appearance for intervenor.

Before: WALD, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

In 1987 the Federal Communications Commission ordered the Communications Satellite Corporation ("Comsat") to refund $39 million in overcharges collected from carrier customers from August 1984 through December 1986. *Communications Satellite Corporation,* 2 F.C.C.R. 3706 (1987), as revised by 3 F.C.C.R. 2643 (1988). As one of these carrier customers, ITT World Communications, Inc. ("ITT") acquired a stake in the refund that has since grown to $1.5 million. Shortly after the Commission announced the refund, however, ITT ceased doing business as a common carrier of satellite services, and a series of complex sales and corporate reorganizations took place. Western Union Corporation acquired all of the stock of ITT and merged it into a successor Western Union Corporation,[1] which thus became the owner of the assets of the old ITT. See *Western Union Corporation,* 2 F.C.C.R. 6063, 6063 (CCB 1987); *Western Union Corporation,* 4 F.C.C.R. 2219, 2221 n. 4 (CCB 1989). In the meantime, Western Union agreed to sell the "international private line communications service" assets of the old ITT—the assets used by ITT in its role as a Comsat customer—to another firm, which in turn transferred those assets to a subsidiary, World

Communications, Inc. ("WorldCom"), now the petitioner before us. WorldCom continues to operate as a common carrier, allegedly serving many of the same customers previously served by ITT. *Application for Review,* p. 7; *Statement of Position of WorldCom, Inc.,* pp. 5–6, 7. Western Union does not currently offer satellite services as a common carrier.

Both Western Union and WorldCom asserted rights to the refund, Western Union as legal successor to ITT, the firm that originally paid the overcharges, WorldCom as successor to the business operations of ITT. The Commission's Common Carrier Bureau awarded the funds to Western Union, without prejudice to any claims of WorldCom under the contract by which it acquired ITT's operations. *Communications Satellite Corporation,* 6 F.C.C.R. 2348 (CCB 1991) ("Bureau Disbursement Order"). The Commission affirmed. *Communications Satellite Order,* 7 F.C.C.R. 4587 (1992) ("Award Order"). Today we uphold the Commission's order and deny the petition for review.

\* \* \*

WorldCom points to no statute or Commission rule directly specifying some principle that should guide the Commission in its allocation of an overcharge refund where the overcharged party has ceased to exist. Thus, we review only for abuse of discretion, as we would other exercises of the Commission's discretionary power to order refunds. *Las Cruces TV Cable v. FCC,* 645 F.2d 1041, 1047 & n. 13 (D.C.Cir.1981).

In using the legal successorship test, the Commission in fact applied a principle it had announced in 1979 to resolve competing claims to refunds of fees paid to the Commission itself. "If through ... the various forms of death of a corporation, the entity originally required to pay the fee no longer exists, the refund may be paid to a successor *if* the request is accompanied by some documentation (contracts, court papers, etc.) demonstrating that the requester has a right to the assets represented by the refund." *Fee Re-*

---

**1.** Western Union in 1991 changed its name to New Valley Corporation, which now appears before us as an intervenor. For simplicity, we use "Western Union" throughout to refer to the post-reorganization Western Union Corporation and its New Valley successor.

*funds and Future FCC Fees,* 71 F.C.C.2d 171, 182 (1979) (emphasis in original). WorldCom does not, as we understand it, seriously claim that ITT should not prevail under the legal successorship test. ITT indeed suffered corporate "death" through merger and Western Union became its legal successor as of December 30, 1987, the date the stock acquisition transaction closed. Although WorldCom vaguely implied in some papers that it received the right to collect the future refund by contract when it acquired the international private line service, *Reaffirmed Statement of Position of WorldCom, Inc.,* p. 5 n. 3; *Reply of WorldCom,* pp. 7–9, it neither pressed the claim nor even introduced the contract into the record. In any event, the Commission's order left World-Com free to use the courts to assert any possible rights under the contract.

■ Petitioner's prime ground for urging reversal rests on its asserted equities as "service successor" to ITT. It contrasts its role as a satellite service provider in filing tariffs and servicing ITT's customer base with Western Union's role as a mere broker of ITT's business operations in holding the assets, without filing required tariffs, for a period of sixteen months. Its position as service successor would, it says, enable it to use the refund for the benefit of ITT's customers (by investment of it in facilities, presumably without an accompanying hike in rates), and it pledged in fact to use most of the refund in just that way. Given these possibilities, it claims that the Commission breached its duty to serve the public interest, see 47 U.S.C. §§ 721(c)(5), 721(c)(10), when it failed to seize this opportunity. Further, it says, its offer to flow the refund proceeds through to its current end users in that fashion makes it akin to the Japanese International Satellite Joint Users Organization ("JISO"), an end user to which the Commission granted a portion of the refund.

Petitioner's public interest argument (apart from its JISO element, to which we return later) is in effect a collateral attack on the Commission's "Flow–Through Order", *Communications Satellite Corporation,* 4 F.C.C.R. 8514 (1989), in which the Commission struck a balance between the benefits and the administrative costs of getting the refunds through to end users. *Id.* at 8515–16 ¶¶ 16–17. It resolved the issue by mandating flow-through *only* for the one "dominant" carrier entitled to an award, namely AT & T, which was entitled to 74% of the total refund (there being only three other carrier customers entitled to as much as $1 million). *Id.* at 8515–16 ¶ 17. As to the non-dominant carriers receiving refunds, the Commission noted that they were not held to the same record-keeping standards as AT & T, and thus could not easily identify overcharged users, and that mergers and corporate reorganizations among Comsat's carrier customers had further complicated the task of calculating end users' entitlements. *Id.*

We are puzzled by some aspects of the Flow–Through Order. It distinguished between dominant and non-dominant carriers largely on the basis of the difference in administrative costs in identifying the *past* usage of particular end-users (to compute their entitlement); these were low for AT & T, high for the non-dominant carriers, especially in relation to the sums involved. But the flow-through remedy that it ordered for AT & T paid no attention to the traffic levels of end-users in the overcharge period. Rather, the Commission simply adjusted the price cap to which AT & T was then subject, *id.* at 8516 ¶ 19, a remedy that helps *current* users in proportion to their current use, not past users in proportion to their use in the overcharge period. It therefore requires no tracing of past purchases. If the order rests on a valid distinction, then, it must be one between the rate regulation methodology applicable to AT & T as a dominant carrier and the Commission's regulatory treatment of non-dominant carriers.

Indeed, it appears that although non-dominant carriers are in principle subject to rate regulation, the market has been so competitive that the Commission has thought it inappropriate to expend resources reviewing non-dominant international carriers' rates. Accordingly, noting the competitive pressures, the Commission decided to streamline the tariff-filing requirements for such carriers. *International Competitive Carrier Policies,* 102 F.C.C.2d 812, 820–21 ¶¶ 21–22, 843–46

¶¶ 74–83 (1985). If market competition was keeping the rates of non-dominant carriers below what formal regulation would have required, then flow-through mechanisms that lowered the formal ceilings would in all likelihood have been a nullity, as well as consuming regulatory resources that the Commission had decided were better employed elsewhere in view of the competitive forces constraining the international carriers' rates.[2]

But whatever the idiosyncracies of the Flow–Through Order, no one appealed this decision at the time, and WorldCom purports not to attack the order even now. The Flow–Through Order reflects the premise that for all but the one dominant carrier the benefits of flow-through were outweighed by its administrative costs. Flow–Through Order, 4 F.C.C.R. at 8515 ¶ 16. WorldCom now challenges that premise, claiming that its "offer" to accomplish flow-through should persuade the Commission to prefer it over the firm that won the refund under the Commission's hitherto established principle.[3] We are, frankly, somewhat uncertain whether WorldCom's offer is meaningful. If the effective constraint on WorldCom's rates at the relevant time was regulation rather than competition, there are, of course, mechanisms by which the Commission could assure that the benefits of the refund would flow through to WorldCom's customers prospectively. See, e.g., *Northern Natural Gas Co. v. FERC*, 827 F.2d 779, 782 (D.C.Cir.1987). But in view of the Commission's findings that competitive pressures justified the streamlining of regulation, and such clues as its decision in early 1986 to drop a pending inquiry into the rates of ITT precisely because the market was proving a more effective constraint on the rates of international carriers generally, *ITT World Communications, Inc. Required Rate of Return*, CC Docket No. 80–633, 1986 FCC LEXIS 4131 *5 ¶ 9 (1986), that mechanism may not have been genuinely available. If in fact the binding constraint on WorldCom's rates was competition, then, given the fungibility of money, its offer to use these proceeds for facilities benefitting its customers may simply mean that it would refrain from using other funds for investment in such facilities, with no effect whatever on customer welfare. Conceivably, however, WorldCom might have used the refund to lower rates to consumers.[4]

The Commission, however, did not strive to assess the true meaning of WorldCom's proposal, but stuck by the legal successorship principle. Bureau Disbursement Order, 6 F.C.C.R. 2348 ¶ 5; Award Order, 7 F.C.C.R. 4587, 4588 ¶ 6. We cannot severely fault it for this. Understood most charitably, WorldCom's proposal to invest to the benefit of end users would have required intensive Commission monitoring of WorldCom's investments and rates, in contradiction with the Commission's determination that for non-dominant carriers the administrative costs of flow-through would exceed its benefits (a determination, to be sure, derived from focus on a somewhat different set of costs). The contradiction is especially acute because, if

---

**2.** The Commission appears to have found AT & T non-dominant for "non-ITMS" services, see *International Competitive Carrier Policies*, 102 F.C.C.2d at 834 ¶ 54, which evidently include private line service, see *id.* at 816 n. 6. However, as the Commission elected to require AT & T to file an accounting and cost allocation plan, it may be that, even assuming that the services involved here qualify as non-ITMS, *id.* at 836–37 ¶ 61, AT & T in fact remained subject to more meaningful rate scrutiny than the other refund recipients.

**3.** WorldCom also argues that, at the time of the Flow–Through Order, it had been designated a dominant carrier due to its foreign ownership, see *International Competitive Carrier Policies*, 102 F.C.C.2d at 842 ¶ 72, and thus is not bound by the public interest determinations for non-dominant carriers. Because the Flow–Through Order purported to calculate the feasibility of flow-through based on records kept (or not kept) during the overcharge period, the relevant inquiry is the status of the carrier at that time. At least by late 1985, when the Commission issued its *International Competitive Carrier Policies* decision, ITT was non-dominant, and that was clearly the premise of the Flow–Through Order.

**4.** It is unclear just why WorldCom would do so. Normally receipt of a windfall, such as is at issue here, would not alter a firm's optimal pricing and investment strategies, which are set by market conditions and other objective factors. Here, however, to the extent that the proposed earmarking of the refund was enforceable, and the funds exceeded what WorldCom would otherwise have invested, the opportunity cost of these funds to WorldCom would effectively be zero, giving it an incentive to invest more and possibly to adopt a different pricing strategy.

WorldCom's claim that flow-through was feasible were valid, it would be equally so for all other non-dominant carriers. Accordingly, we think the Commission was entitled to proceed in the straightforward, if cursory, way that it chose.

The Commission's award to JISO appears consistent both with the Flow–Through Order and its treatment of WorldCom. JISO submitted evidence—evidently uncontested—that it was the end-user receiving certain services in the overcharge period, services for which an intermediate carrier had been charged. The Common Carrier Bureau responded affirmatively to its application for a refund, observing that "the end user is identified and *no* administrative burden is imposed on the successor". Bureau Disbursement Order, 6 F.C.C.R. at 2348 ¶ 7 (emphasis added). Thus the Commission's award fitted the reasoning of the Flow–Through Order. WorldCom's theory, by contrast, would have achieved "flow-through" (if at all) only by reversing the Flow–Through Order's conclusion on the balance between the benefits and administrative costs of flow-through.

■ WorldCom appears to think that Western Union's failure to file tariffs in a period where it ought to have, and WorldCom's assuming ITT's tariffs and then filing revised tariffs pursuant to 47 CFR §§ 61.171 and 61.172, somehow strengthen its claim to the refund. It cites no authority for the idea that denial of previously accrued refunds is a suitable punishment for tariff-filing violations, and we can imagine none; the governing statute prescribes monetary forfeitures as the penalty. 47 U.S.C. § 203(e). WorldCom's own filings simply manifest its service successorship; its repetition of the argument in this form adds nothing.

■ WorldCom deploys a couple of additional arguments. First, it says that the Award Order is internally inconsistent insofar as it expressly declines to resolve the contract dispute while handing the funds to one of the parties. We see no inconsistency. The Commission simply applied its legal successorship test, but, in case WorldCom were serious about its undeveloped claim that a later contract transferred the entitlement, left it open to WorldCom to prove it in another forum. The fact that the parties may have altered the default rule of legal successorship through contract is not inconsistent with the application of the legal successorship test in the first instance. Cf. *Northwest Airlines, Inc. v. U.S. Department of Transportation*, 15 F.3d 1112 (D.C.Cir. 1994) (characterizing DOT decision as a "reasonable attempt to preserve the final say on the contractual issues for the bankruptcy court"). Second, WorldCom contends that the Commission's leaving the contract issue to the civil courts violates the doctrine of primary jurisdiction. This seems an odd way of faulting the Commission for declining to slam the door on WorldCom's half-baked contract claim. If in fact WorldCom thinks the claim worth pressing in court, and if the court believes the nature of the dispute such as to require the Commission's judgment—which seems most improbable as the remaining dispute relates only to interpretation of a non-tariff contract, compare *Allnet Communication Service v. NECA*, 965 F.2d 1118 (D.C.Cir.1992)—the court can hold the case in abeyance while the parties secure that judgment, see, e.g., *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 432–33, 60 S.Ct. 325, 331, 84 L.Ed. 361 (1940).

Accordingly, the petition to review is

*Denied.*