HUMBLE OIL & REFINING COMPANY, a Delaware corporation (Substituted for The Carter Oil Company, a West Virginia corporation), Plaintiff,

v.

GREAT NORTHERN RAILWAY COMPANY, a corporation, Northern Pacific Railway Company, a corporation, and Spokane International Railroad, a corporation, Defendants.

Civ. No. 251.

United States District Court
D. Montana,
Billings Division.

Dec. 31, 1962.

---

Fred W. File, Tulsa, Okl., John D. Knodell, Denver, Colo., and Burke, Hibbs & Sweeney, Billings, Mont., for plaintiff.

R. Paul Tjossem, Roger J. Crosby, Seattle, Wash., and Lamey, Crowley, Kilbourne, Haughey & Hanson, Billings, Mont., for defendants.

JAMESON, District Judge.

Plaintiff seeks damages by way of reparations for alleged overcharges made by defendants in the transportation of petroleum products from East Billings, Montana, to points in Idaho and Washington between December 12, 1953 and December 8, 1955, plaintiff claiming that the rates charged were in excess of the legal tariff. Plaintiff filed overcharge

claims, which were denied.[1] Plaintiff then filed a complaint with the Interstate Commerce Commission pursuant to 49 U.S.C.A. § 13. In Docket No. 32,101, by order dated April 23, 1959, the Commission awarded reparations to plaintiff in the amounts sought in this action. Defendants failed to pay the award, and this action was instituted pursuant to Section 16(2) of the Interstate Commerce Act, 49 U.S.C.A. § 16(2).[2]

Effective May 2, 1952, the defendants had amended their tariff by reducing the rate for the transportation of petroleum products from East Billings to Spokane, Washington from 71.3 cents per 100 pounds to 55 cents. Subsequently defendants published and filed with the Commission tariff supplements reducing the rate from 55 cents to 53 cents[3] to be effective January 10, 1953. The reduced tariffs were suspended by the Commission until August 9, 1953,[4] and thereafter voluntarily postponed by the defendants until 12:01 A.M., December 9, 1953, in I & S Docket No. 6062, 291 ICC 101 and 292 ICC 317. By order dated November 25, 1953, the Commission approved the reduced rates and discontinued the proceedings.

At 4:00 P.M. on December 8, 1953, certain truck and barge lines which had opposed the reduced rates in I & S 6062 obtained a temporary restraining order in the United States District Court for the District of Oregon in Cause No. 7278, entitled "Pacific Inland Tariff Bureau et al. plaintiffs, v. United States of America et al. defendants" which, among other things, temporarily restrained and enjoined the Interstate Commerce Commission from carrying into effect the terms and conditions of the Commission's order dated November 25, 1953, and temporarily restrained and enjoined the defendants "from publishing or making effective and from assessing, charging, collecting, or enforcing" the reduced rates named in the supplements. When the restraining order was obtained at 4:00 P.M., Pacific Standard Time in Portland, Oregon, it was 7:00 P.M., Eastern Standard Time in Washington, D. C., the place where the Interstate Commerce Commission's Office for filing tariffs is situated, and the office had been closed for two hours at the time the restraining order was issued.

The defendants promptly moved the court to quash the restraining order on the ground that the court lacked jurisdiction to restrain rates which were on file with the Interstate Commerce Commission. This motion was denied, and a three-judge court was convened. The injunction was continued in effect until December 9, 1955, when it was canceled and set aside by the three-judge court.

In I & S Docket No. 6062 plaintiff appeared in support of the carrier's application to reduce rates. Plaintiff was not a party to the proceedings in the United States District Court in Oregon.

1. Except for 32 claims against the defendant Northern Pacific Railway Company, which defendants claim were paid through inadvertence.

2. Section 16(2) reads in pertinent part: "If a carrier does not comply with an order for the payment of money within the time limit in such order, the complainant * * * may file in the district court of the United States * * * a complaint setting forth briefly the causes for which he claims damages, and the order of the commission in the premises. Such suit in the district court of the United States shall proceed in all respects like other civil suits for damages, except that on the trial of such suit the findings and order of the commission shall be prima facie evidence of the facts therein stated, and except that the plaintiff shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings unless they accrue upon his appeal. If the plaintiff shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit."

3. The parties have agreed that the rates from East Billings to Spokane are representative of the total rate application.

4. The Commission may suspend the operation of a rate schedule for not more than seven months. 49 U.S.C.A. § 15(7).

By letter dated December 10, 1953, the defendants notified plaintiff that the restraining order had been entered and served and stated: "Under these circumstances the rates which became effective under the published tariffs on December 9, 1953 cannot be charged because to do so would put the rail carriers in contempt of court. * * * (I)t will be necessary * * * to assess and collect the rates in effect on December 8, 1953, on all traffic moving until the restraining order is dissolved."

Telegrams were sent to defendants by the Interstate Commerce Commission as follows:

1. On December 11, 1953, "Commission is advised that the Federal District Court for Oregon on December 8 temporarily restrained railroads from making effective petroleum rates approved by Commission in I&S 6062. It is assumed that in deference to Court's order your company will forthwith cancel rates which became effective December 9, and restore former rates. Advise."

2. On December 14, 1953, "You may have and apparently do have valid excuse for making these rates effective despite Court order but I see no reason why either Commission or Court's order should excuse you for violating the Interstate Commerce Act by charging rates other than those stated in your tariff as you are doing and propose to continue doing."

3. On December 23, 1953, "Validity of Court order not questioned here but neither is it construed as authorizing carriers to violate the Interstate Commerce Act by disregarding tariffs in collecting charges. Such violations could have been avoided and unless Court order was dissolved on the eighteenth further violations should be avoided by promptly amending tariffs as suggested by telegram eleventh."

For the period December 9, 1953 to December 9, 1955, when the restraining order and injunction were canceled, the defendants continued to charge on the basis of the rate in effect on December 8, 1953, i. e., 55 cents from East Billings to Spokane. Immediately upon cancellation of the injunction the defendants commenced charging the rates named in the tariff supplements, i. e., 53 cents from East Billings to Spokane. No amended tariff supplements were filed and published at any time.[5]

The question for determination is whether plaintiff is entitled to the two cent difference in rate for all shipments between December 9, 1953 and December 8, 1955. The parties have agreed upon the amounts of the alleged overcharges and have agreed further that if plaintiff is entitled to recover, it is also entitled to interest at 4% per annum from the respective dates of payment of the overcharges and to attorney fees.

Plaintiff contends: (1) That the tariff as filed and published is binding upon both the shipper and the carrier, has the effect of statute, and that any evidence with respect to the restraining order and injunction granted by the court in Oregon is incompetent; (2) that if this evidence is received, the restrain-

---

5. The proceedings in the Oregon court embraced rates published in three separate tariff publications, including Tariff No. 14-Q ICC 859, covering traffic moving eastbound. Defendants amended the provisions of this tariff by inserting in Supplement No. 25, dated January 14, 1954, the following:
"Contains Interstate Rates Subject to Restraining Order of the U. S. District Court for the District of Oregon, Cause 7278."
This language was carried forward in each supplement to that tariff as long as the court's injunction was in effect and, when the injunction was dissolved, the defendants inserted in Supplement No. 65 to Tariff No. 14-Q, ICC 859, the following language:
" 'Contains Interstate rates subject to Restraining Order of the U. S. District Court for the district of Oregon in Cause 7278.'
"The restraining order referred to having been dissolved by its own terms at 12:01 A.M., December 18, 1957, the rates as published in Supplements 11 and 12 and as amended, heretofore previously restrained, are therefore effective with December 18, 1957."

ing order and injunction would not change the rates filed and published in defendants' tariff; (3) that the defendants took no action to change the effective tariff; and (4) that even if the defendants, in obedience to the restraining order and injunction, were required to collect the higher rates in effect, upon dissolution of the injunction, plaintiff was entitled to the benefit of the lower rates which were legally in effect.

Defendants contend: (1) That the reduced rate did not become effective until the United States District Court for Oregon dissolved its injunction on December 9, 1955; (2) that the plaintiff was not damaged by the action of the defendants in not canceling their supplements naming the reduced rates or in not publishing a notice that the reduced rates were subject to the restraining order; (3) that the defendants' refusal to contract for transportation at the enjoined rates during the life of the injunction was compelled by the injunction and this is a complete defense; and (4) that the order of the Interstate Commerce Commission in Docket No. 32,101 is erroneous and unlawful.

While counsel for plaintiff contend that any evidence with respect to the injunction is incompetent and inadmissible, I agree with counsel for the defendants that, in effect, plaintiff is contending that the facts relied upon by the defendants with respect to the injunction do not constitute a defense. That, it appears to me, is the real issue presented. All objections to the introduction of evidence are overruled, and all evidence submitted will be considered by the court.

Subparagraph 1 of Section 6 of the Interstate Commerce Act (49 U.S.C.A. § 6(1)) provides that common carriers shall file with the Interstate Commerce Commission, and print and keep open to public inspection, schedules showing all rates, fares, and charges for transportation. It provides further that the schedules shall be plainly printed in large type and posted in two public and conspicuous places in every depot, station, or office where passengers or freight are received for transportation. Subparagraph 7 provides in pertinent part that no carrier shall "charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time * * *."

One of the principal purposes of the Interstate Commerce Act was to prevent discrimination by granting preferential rates. Accordingly there was imposed "upon all carriers the positive duty to establish schedules of reasonable rates which should have a uniform application to all and which should not be departed from so long as the established schedule remained unaltered in the manner provided by law." Texas & P. R. Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 439, 27 7S.Ct. 350, 51 L.Ed. 553, 558.

The Court of Appeals for the Ninth Circuit had occasion to consider the effect of a tariff on file with the Commission in Chicago, M., St. P. & P. R. Co. v. Alouette Peat Products, 1957, (rehearing denied 1958), 253 F.2d 449, where the carrier had filed and published rates on less than 30 days notice, in violation of the Interstate Commerce Act. In upholding the shipper's right to reparations, the court summarized the rules with respect to the effect of the filing and publication of rates as follows:

"Under the Act the shippers have always been required to pay, and carriers collect, the rate specified in the tariff on file with the Commission. Davis v. Portland Seed Co., 264 U.S. 403, 425, 44 S.Ct. 380, 68 L.Ed. 762. However, if this filed rate was proved to be unreasonable upon complaint to the Commission, the shipper was entitled to recover the difference between what he had paid and what the Commission found to be the reasonable rate. Pennsylvania R. Co. v. International

Coal Min. Co., 230 U.S. 184, 197, 33 S.Ct. 893, 57 L.Ed. 1446. So in the situation which exists in this case. The shippers were bound to pay the rates specified in the tariff on file with the Commission, but upon proof that the rates were not lawfully established, they became entitled to recover the difference between what they had paid and the lawfully established rate. There is no reason under the Act why a shipper should not be protected in the situation here existing where the rates are unlawful because not lawfully established, just as he is protected in the situation where the rates are unlawful because unreasonable. In either case, the protection is against unlawful rates. Thus under the Act, a rate, to have final lawfulness and validity, must be lawfully established (Sec. 6, Par. 7, 49 U.S.C.A.), must be just and reasonable (Sec. 1(5), 49 U.S.C.A.) and nondiscriminatory and nonprejudicial (Sec. 3, Par. 1, 49 U.S.C.A.). Lacking any of these essentials, it cannot be the valid, lawful rate even though it becomes the applicable rate by virtue of being on file with the Commission." (253 F.2d at 455)

We turn now to the crucial point of the case: What was the effect of the restraining order issued on December 8, 1953, followed by the temporary injunction which continued until December 8, 1955, when it was "cancelled and set aside"?

Under the restraining order the defendants were restrained from publishing, making effective, or charging the reduced rates. Plaintiff contends that the order was "strictly in personam", "did not act upon the rates themselves", and "did not of itself prevent the rates from becoming effective". Defendants contend that while at the time of the proceedings before the United States District Court in Oregon they argued that "the restraining order and injunction ought not to have been issued since it constituted a direct interference with the legislative rate-making power of the Interstate Commerce Commission", and while they are still of this view, "nevertheless the injunction was issued and no matter how erroneous it may have been, until it was dissolved by competent authority the defendants had no course other than to honor the injunction".

A stay order does not of course adjudicate rights, but merely preserves the status quo. Courts do not have the power to establish rates. The restraining order did, however, prevent defendants from charging the reduced rates until the order was dissolved. The order could not be ignored by defendants. United States v. United Mine Workers, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884; Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797.[6]

The dilemma confronting defendants upon the issuance of the restraining order was well stated by their counsel in urging a dissolution of the order:

"What was the effect of this restraining order? On the morning of December 9 the rail carriers had these courses open to them: first, they could have collected from shippers on shipments pending the lawful rates which were the lower rates but which were enjoined by the temporary restraining order; second, they could have continued to charge the rates which were in effect on December 8 and prior thereto; third, they could have refused to accept shipments tendered; fourth, they could have republished by new tariffs filed with the Commission the earlier rates to make them the lawful rates."

6. In Gompers v. Buck's Stove & Range Co., the Court said in part: "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery."

It is of course clear that if the defendants had followed the fourth course the plaintiff could not claim any overcharges. Defendants contend, however, that if this had been done the proceeding in the United States District Court in Oregon would have become moot.

In Cantlay & Tanzola v. United States, S.D.Cal.1953, 115 F.Supp. 72, a three-judge court had under consideration an action by certain truck carriers to enjoin a similar order of the Interstate Commerce Commission. In that case, however, after a motion to dissolve the temporary restraining order was dismissed, the rail carrier defendants "requested and obtained authority from the Commission to restore the status quo ante, and * * * restored the higher rates which prevailed" before the reduced rates took effect. Both parties rely upon this case, defendants contending that the court there held that the defendants had made the proceedings moot by republishing the prior rates. Plaintiff argues, however, that "the restraining order then in effect was moot because the higher rates were then legally effective."

In the proceedings in the Oregon court on December 29, 1959, Judge Fee said that there was one important phase of the opinion in Cantlay & Tanzola v. United States with which he did not agree and expressed the view that refiling and publication of the old rates would not "make the case moot as far as I am concerned".[7] At this hearing, counsel for the defendants indicated that they were considering whether they could republish the prior rates without endangering the lawsuit and possibly making it moot, stating that they did not "under any circumstances want this lawsuit to become moot".[8]

Unquestionably, the proceedings in the Oregon court placed the defendants in an unfortunate dilemma. Had the prior rates been republished, there would be no question of their right to collect the 55 cent rate and this lawsuit would have been avoided. On the other hand, if the prior rates were republished, there was a substantial risk that the Oregon court would then conclude that the court proceedings were moot. In that event there would have been no judicial determination of whether the 53 cent rate could at any time be collected. Defendants resolved the dilemma by deciding that they would not republish the old rates in order to avoid the possibility of the court holding the controversy moot.

The Interstate Commerce Commission, in its order, took the position that " * * the issuance of a tariff supplement further staying the effective date of the

---

7. Judge Fee said in part:

"I understand that Judge McColloch made a similar suggestion, and I am fully in accord with it. The idea that I have is that if the rates were reinstated in that way it would be just the same as having been done by agreement of the carriers, as they did for several months with the Interstate Commerce Commission, and that there is no reason why that cannot be done and in this case was done by injunction.

"As far as I am concerned I will construe that in this way: That the previous rates are continued in effect, but if the rail carriers wish to confirm them in order to keep out of difficulty with the Interstate Commerce Commission, or something else, I would permit them as far as I am concerned, to publish that rate again and publish it as a rate that is in effect anyhow. I don't care whether that suggestion is followed or not, because I think, as far as I am concerned, that the previous rates are now extended because they were not superseded by the new rates which were proposed."

8. Counsel said in part: "Now, whether we may with impunity republish the lower (sic) rates, or whether that does endanger our lawsuit, possibly making it moot, we are seriously considering that question now, and it is being discussed back and forth between the law departments and traffic departments of the carriers. Our present view is that we do not under any circumstances want this lawsuit to become moot. And we may run the risk of charges that we are violating the Interstate Commerce Act by refraining from publishing higher rates, but we are complying with the orders of the court."

reduced rates for an indefinite period beyond December 8, 1953, would not have affected the pending court action". This seems questionable in view of the Commission rule cited in defendants' brief.[9] In my view of the case, however, it is unnecessary to determine whether this procedure was available to the defendants or whether republishing the prior rates would in fact have rendered the Oregon court proceedings moot.

The "Final Judgment and Decree" entered in the Oregon Court on December 9, 1955, provides that the orders entered by the Interstate Commerce Commission on November 25, 1953, and April 19, 1954,[10] insofar as they relate to the rates in question, "are affirmed and this suit shall be and the same is hereby dismissed; and the temporary restraining order made and entered by this Court on December 8, 1953, as amended and modified by the order of this Court made and entered on December 23, 1953, and as continued in effect by the order of this Court made and entered on May 27, 1954, in so far as said orders of December 8,

1953, December 23, 1953, and May 27, 1954, relate to said westbound rates above described in this paragraph 2, shall be and it is hereby cancelled and set aside".[11]

Defendants did not at any time amend their published tariffs to show the effect of the court's injunction.[12] Nor did defendants deem it necessary to publish any amended or supplemental tariff when the court in its final judgment affirmed the findings of the Commission and cancelled and set aside its restraining order.

Apparently the parties agree that the reduced rate published by defendants to become effective at 12:01 A.M. December 9, 1953, was the lawful rate. Defendants contended before the Oregon court that the "tariffs (publishing the reduced rate) went into effect; by their own terms they cancelled the old rates".[13] That is the position of plaintiff in the instant case.

The cases are uniform in holding that, "The Court is without authority to establish rates." Chicago, M., St. P. & P. R. Co. v. Alouette Peat Products, su-

9. Rule 9(k), as set forth in Commission's Tariff Circular No. 20 and all changes thereto accumulated in pamphlet dated 1956, which forms a part of exhibit 11.

10. In the decision of November 25, 1953, Division 2 of the Commission found the proposed reduced rates just and reasonable. 291 ICC 101. Upon reconsideration the decision of Division 2 was affirmed by the entire Commission on April 19, 1954. 292 ICC 317.

11. Opinion of the three-judge court dated March 3, 1955, making the injunction permanent, is reported at Pacific Inland Tariff Bureau v. United States, D.C., 129 F.Supp. 472. Opinion denying motion for new trial dated September 12, 1955, and modifying opinion of March 3, 1955, is reported at 134 F.Supp. 210. The findings of the Commission, affirmed in the final judgment and decree of December 9, 1955, were not discussed in the judgment, and as far as shown by the record, no opinion was published (or rendered) at that time.

12. As set forth in Note 5, a different course was followed with respect to the tariff covering eastbound traffic.

13. Counsel for defendant argued before Judge McColloch as follows:

"(Quoting) 'There can be no question that to enjoin a rate already established and in operation and to require the carrier to observe a previously established rate no longer in effect is to make a rate. The Court can have no more power to say that the carrier shall go back to a superseded rate than it has to fix a wholly new rate. In either case the Court establishes a rate.'

"Irrespective of who caused it or how it was caused, without any criticism directed to anyone, the fact is that before your Honor could make effective any restraining of these defendants, and before we even had knowledge that your Honor might attempt that, these rates were going into effect automatically, as the petitioners allege; nothing could be done to stop them, so they are asking your Honor to enjoin and restrain us from collecting the only charges on file. If we cannot collect those charges, we certainly are entitled to compensation for the service we are rendering. Somebody is going to have to give us that.

"These tariffs went into effect; by their own terms they canceled the old rates." (Ex. 10)

pra, citing United States v. Kansas City Southern Railway Co., 8 Cir. 1955, 217 F.2d 763, where the court said: "It must be remembered that the courts are not entitled to engage in any semblance of rate-making whatsoever, either indirect or direct, such as attempting to put a value as such, for any purpose, on any aspect of carrier service, which a tariff does not make legally clear." (217 F.2d at 768).[14]

It is true, as defendants contend, that the injunctive order did in fact prevent defendants from collecting the reduced rate during the period the order was in effect. Defendants now argue, contrary to their position before the Oregon court, that the injunctive order had the effect of maintaining the status quo as of December 8, 1953, and that as a consequence "the 53 cent rate did not become effective until the injunction was dissolved". I agree with the position taken by defendants before the Oregon court, and by plaintiff here, that to hold that the prior "superseded" rate was in effect subsequent to 12:01 A.M. on December 9, 1953, would result indirectly in the establishment of a rate by court order.

In other words, the lawful rate during the period in question was the reduced rate published by defendants in their tariff supplement. That rate could not be collected by reason of a court order which the parties agree was erroneous. While the injunctive order prevented the collection of the lawful rate, it did not affect the validity of that rate.

A comparable, although not identical situation, was considered in Socony Mobil Company v. Brooklyn Union Gas Company, 5 Cir., 1962, 299 F.2d 692, cert. denied 1962, 83 S.Ct. 182, where distributors of natural gas sought recovery of monies paid by pipeline companies to producers through price increases.[15] The court permitted recovery of amounts paid in excess of the last effective filed rate schedule during pendency of court of appeals stay orders restraining the Federal Power Commission from preventing producers from collecting higher contract rates. The court held that the stay orders did not obviate the necessity of producers filing rate schedules in accordance with the Natural Gas Act and Federal Power Commission regulations. With respect to the effect of the stay orders, the court said:

"The stay orders cannot be construed as protecting Mobil and Ohio et al in the retention of the overcharges for two reasons: (1) this court does not have the authority to establish rates, and to construe the stay orders as approval of the increased rates would be to impute to the court the doing indirectly what the court could not do directly; and (2) although the stay orders, until dissolved, supported Mobil and Ohio's et al action in collecting the proposed rate for the time being, in the sense that the Commission was restrained from preventing them from making such collections, the stay orders did not attempt to, they could not, obviate the necessity of filing them in acordance with the statute and the regulations of the Commission. * * *

"* * * At the time the stay orders were issued, the lawful rates established, by virtue of the Act and the regulations of the Commission, were the contract rates of June 7, 1954. The stay orders did not deal with, or attempt to change, this situation at all. This court did not, indeed could not, authorize an increase in the lawful rates. Such authority could be granted only by a compliance with the statute and reg-

14. See also Arrow Transportation Co. v. Southern Railway Co., 5 Cir., 1962, 308 F.2d 181.

15. I agree with counsel for defendants that this case is factually different in many respects; but it appears to me that the principles of law therein set forth are equally applicable in the instant case, in view of my conclusion that the reduced rate was the lawful rate subsequent to 12:01 A.M. December 9, 1953.

ulations promulgated under its authority. The stay orders could not have had any effect on the statutory scheme." (299 F.2d at 695)

So, here, the lawful rates effective at 12:01 A.M. December 9, 1953, were the reduced rates. The final judgment and decree, entered December 9, 1955, affirmed the findings of the Interstate Commerce Commission (including the finding that the rates were just and reasonable), dismissed the action, and cancelled and set aside the stay order. While the stay order was in effect defendants were prevented from collecting the reduced rates. This does not mean, however, that defendants may retain the overcharges which they were required to collect during the period the order was in effect. To permit this retention would result indirectly in establishing a rate by court order for that period.

It is unnecessary for plaintiff to show damage from the collection of the 55 cent rate. Plaintiff seeks reparation for overcharges rather than damages. The distinction between a claim for damages and a claim for overcharges was set forth clearly in Chicago, M., St. P. & P. R. Co. v. Alouette Peat Products, supra, where the court said: " * * * That there is a distinct difference under the Act between a claim for damages and a claim for overcharge is made manifest by the provisions of Section 16, Paragraph 3 of the Act, which provides in one paragraph a statute of limitations for the recovery of damages, and in a separate paragraph a statute of limitations for the recovery of overcharges. Furthermore, Section 16, Paragraph 3, subparagraph (g) of the Act defines overcharges as follows:

" 'The term "overcharges" as used in this section shall be deemed to mean charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the commission.' " (253 F.2d at 456)

The distinction between reparations and damages was recognized by the Supreme Court in Southern P. Co. v. Darnell-Taenzer Lumber Co., 1918, 245 U.S. 531, 534, 38 S.Ct. 186, 62 L.Ed. 451, 455, where the Court said in part:

"The cases like Pennsylvania R. R. Co. v. International Coal Mining Co., 230 U.S. 184, [33 S.Ct. 893, 57 L.Ed. 1446], where a party that has paid only the reasonable rate sues upon a discrimination because some other has paid less, are not like the present. There the damage depends upon remoter considerations. But here the plaintiffs have paid cash out of pocket that should not have been required of them, and there is no question as to the amount of the proximate loss. See Meeker v. Lehigh Valley R. R. Co., 236 U.S. 412, 429 [35 S.Ct. 328, 59 L.Ed. 644]. Mills v. Lehigh Valley R. R. Co., 238 U.S. 473 [35 S.Ct. 888, 59 L.Ed. 1414]." [16]

The stipulations in the pretrial order and this opinion shall constitute findings of fact, and this opinion shall constitute the court's conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Plaintiff will prepare, serve and lodge form of judgment pursuant to Rule 11(b) of the local rules of court.

16. See also Armour & Co. v. Atchison, Topeka & Santa Fe Ry. Co., 7 Cir., 1958, 254 F.2d 719, 723, where the court said: " * * * There was no reliance by appellee on any conduct of the railroads which resulted in damage to appellee. This recovery is, in effect, a windfall. Appellants concede, however, as they must, that the legality of the rate claimed applicable is not dependent upon the equities involved. The only lawful rate is the rate published in the tariff. (Citing cases.) A mistake in the publication of a rate in a tariff schedule is no justification for a departure from the published tariff. * * *

"It has also clearly been established that in a straight overcharge case based on Section 6(7) of the Interstate Commerce Act, 49 U.S.C.A. § 6(7), no proof of damage other than payment of charges in excess of the published rate is necessary."